## Carr *against* Wallace.

The owner of part of an inlot in the town of Alleghany is entitled to a right of common upon the land reserved for that purpose by the original survey and location of the town. But the owners of outlots are not entitled to such right of common.

If one knowingly, though passively, suffers another to purchase and spend money on land, under an erroneous opinion of title, without making known his claim, he shall not afterwards be permitted to exercise his legal right against such person.

ERROR to the district court of *Alleghany* county.

Samuel Carr against Mary Wallace. This was an action for a disturbance of the plaintiff's right of common upon a piece of land in the town of Alleghany. The plaintiff's right was founded upon his title to part of an inlot in the town, and an outlot.

The facts of the case are fully stated in the opinion of the court.

*Biddle,* for the defendant, rested the defence upon three grounds. 1st. The owner of part of an inlot was not entitled to the right of common which was originally appurtenant to the whole lot. 2d. That the right of common was not appurtenant to an outlot. 3d. That the plaintiff was equitably estopped from asserting his right by the facts proved in the cause.

*M'Candless* and *Forward,* for the plaintiff below, argued that the plaintiff's title was on record, of which the defendant had or might have had notice; that he was not a party to any arrangement by which the right of common was parted with; that having the undoubted right, he had never parted with it either actually or impliedly; that as to him this was the ordinary case of one person taking the possession of the property of another without his consent, and without consideration.

The court below (Grier, President) instructed the jury that the

[Carr v. Wallace.]

third point made by the plaintiff below was sound, that he was equitably estopped from a recovery.　The first two points were ruled *pro forma* for the defendant that they might be presented to this court.

The opinion of the Court was delivered by

ROGERS, J.—This is an action on the case brought for the purpose of testing the title to fourteen acres of land, now occupied as a theological seminary by the General Assembly of the Presbyterian Church. The plaintiff declares as a part owner of one of the inlots in the town of Alleghany; and in his second count as the owner of an outlot attached to the town; and in support of his declaration he has shown title to part of an outlot, and also to a portion of an inlot in the town. The learned judge of the district court has given a brief but accurate history of the case, which appears to be this.　By an act passed the 12th of March 1783, appropriating certain lands for the redemption of depreciation certificates, a tract of three thousand acres was reserved by the commonwealth, opposite fort Pitt, now the city of Pittsburgh.　By another act passed the 11th of September 1787 the supreme executive council were empowered to cause to be laid out and surveyed a town in lots, with a competent number of outlots for the accommodation thereof; and to cause to be laid out and surveyed the residue of said tracts in lots, which last mentioned lots were directed to be not less than one acre nor more than ten acres each.　They were likewise directed to reserve out of the lots, and for the use of the state, so much land as they may deem necessary for a court house, jail, market house, &c.; and without the town one hundred acres for a common pasture.　The town was laid out in pursuance of the act, and afterwards the lots were sold by auction, and every purchaser of a town lot got also an *outlot* in connection with his inlot.　The patents describe the commons as the common ground belonging to the town.　By an act passed the 18th of February 1819 the legislature granted fifty acres of the common, without the consent of the owners of the town lots, to the Western University of Pennsylvania.　In consequence of the manner in which the trustees of the university undertook to locate their grant, the lot holders, deeming it highly injurious to their interest, resolved to try the constitutionality of the law.　Accordingly a suit was brought, which was decided at the September term 1824.　In that case, the Western University *v.* Robinson, it was held, that the state had the right of soil, but subject to the right of common; and that this right the lot holders might either release or modify, at their pleasure, with the assent of the legislature.　Two or three years after this decision in which their rights are thus recognized, the lot holders, having understood that the General Assembly of the Presbyterian Church intended to erect a theological seminary somewhere in the western country, called a public meeting to devise measures to induce the General Assembly to locate the institution in the town of Alleghany.　They supposed that great advantages would result to them from such an

[Carr v. Wallace.]

establishment; and it has been insinuated that some of them advocated the measure to rid themselves of the odium which had been attempted to be fixed upon them as the enemies of education. But whatever may have been their motives it is very certain that more than one public meeting was called with that avowed purpose; and that at the first meeting but three individuals made any objection to such an appropriation of part of the common. They appointed a committee to survey a portion of the ground, the least valuable as a common, but which would be a good site for a building, and would the least interfere with the full enjoyment of the remainder of the common. After this another meeting is called, at which all objections previously made are abandoned. The commissioners of the General Assembly are invited to attend another meeting, and the land in dispute is offered as an inducement to the General Assembly to locate the institution in the town of Alleghany. A deed of release is also drawn and signed by a large proportion of the lot holders and sent to the legislature. An act is passed at their desire, vesting in trustees, for the use of the seminary, the land in question. The deed shows the motives which governed them. It recites, that whereas the General Assembly of the Presbyterian Church in the United States have declared their intention of establishing somewhere in the western country a theological seminary of learning, on a plan similar to the one now in operation at Princeton, and therefore we, the subscribers, resident lot holders and land owners in the town of Alleghany, &c., being duly sensible of the advantage that would result from the establishment of such an institution, and as an inducement to its location, on the condition that a seminary should be established in the town of Alleghany, and so long as the same should continue there, we, the said resident lot holders and land owners, at a public meeting held this day in said town of Alleghany for that purpose, do hereby give, grant, &c.

By means of the offer thus made and a liberal subscription by the inhabitants, the General Assembly were prevailed on, and it would seem with some difficulty, to pass by other advantageous offers made by the inhabitants of other places, and to locate the seminary in the town of Alleghany. Before the expenditure of any money, persons were employed to go round and procure the written assent or release of every person then known to hold a lot in the town, whether resident or not. On the faith, therefore, and with the confident belief that the assent of all who had an interest in the common had been obtained, the directors of the seminary proceeded to the erection of the buildings in a most conspicuous place, and at an expense, for the excavation and the necessary buildings, of upwards of 25,000 dollars. Two or three years are spent in making these expenditures, during which not one whisper of discontent is heard, nor are the trustees from any quarter apprized that there is the slightest objection on the part of any person to the occupancy of a portion of the common for the use of the seminary. After the lapse of several

[Carr v. Wallace.]

years, when the town has increased in size and property has risen greatly in value, this suit is brought to test the title, in effect to retract the grant after this great expenditure made at their instance and request. There can be no doubt as to the accuracy of this statement; and on these facts, which cannot be denied, three questions arise. 1st. Whether the owner of a part of an inlot has a right of commonage? 2. Whether the proprietors of outlots, or parts of outlots, are entitled to commonage. And lastly, whether, under the facts, the jury may and are bound to presume a release from the plaintiff, or those under whom he claims, or an assent or acquiescence by him or them in the erection of the buildings and in the occupation of the property by the theological seminary. These propositions, it is believed, embrace the whole case.

The first point seems to be fully settled on the authority of Wild's Case, 8 *Co.* 78. If a commoner purchases part of the land in which he has a common appendant, the common shall be apportioned; but if he purchases parcel of the land in which he has common appurtenant, such common is extinct. But in either case, when appendant or appurtenant, the common shall be apportioned by the alienation in fee of parcels of the land to which it is appendant or appurtenant. If he who has a common appurtenant purchases parcel of the land in which, &c., all the common is extinct; or if he takes a lease of parcel of the land, all is suspended, because it is the folly of the commoner to intermeddle with part of the land in which, &c., which belongs not to him; but when the commoner intermeddles, but only with his own land, alienation thereof, that shall not in such case turn to his prejudice, for that is not against any rule of law, as the other case, when he purchases part of the land in which, &c., because his common appurtenant was against common right; and he cannot common on his own land which he purchased. And it will be a great inconvenience, say the court, if, by the alienation of parcel, the alienee shall lose his common which belongs to him, for the alienor shall lose his common also; if the law should be such, all common appurtenant would be destroyed (which would be against the commoner), for no land continues in so entire a manner every acre together with another as it has been *ab initio*, but, for preferment of younger sons, advancement of daughters, payment of debts or other necessary considerations, part has been severed; and therefore the case is not like a condition or *nomine pœnæ*, which are entire and not severable by the act of the parties, but is like a rent reserved on a lease for years; and therefore if a man makes a lease of three acres, each of equal yearly value, rendering 3 shillings rent, and the lessor grant the reversion of one acre, and the tenant attorns (the attornment is not necessary), the grantor shall have 12 shillings rent, for although it was one lease, one reversion and one rent, yet that was incident to the reversion, which was severable, and the rent shall wait upon the reversion and upon every part of it. So in Wild's Case the court also say: "al-

[Carr v. Wallace.]

though at the beginning there was but one common attendant upon one tenancy, yet, forasmuch as it was attendant upon the tenancy which is severable, and upon every part of it, the alienee of part of the tenancy shall have common. So if he who has common appurtenant leases part of the land to another, the lessee shall have common for the beast *levant* and *couchant.*" The same principles are decided in Tyrningham's Case, 4 *Co.* 36, *b*; and in an anonymous case in *Hobart* 235, it is held that common appurtenant shall be apportioned upon sale of part of the land. And in Lenial *v.* Hanles, 3 *Keb.* 66, *pl.* 4, it is ruled that there may be an apportionment of common appendant or appurtenant certain; but common appurtenant only can be severed, and granted to another. See also, to this point, Cowlan *v.* Stark, 15 *East* 108; 1 *Inst.* 122, *c.* 227; *Cro. Ch.* 482. In the case at bar the common is appurtenant to the lot arising from grant, and comes within the principle decided in the cases cited.

We are next to inquire whether the proprietors of outlots, &c. are entitled to commonage. This question not only affects the interests of the holders of outlots, but has a material bearing, in one respect, on the next point which remains for examination. It depends on the construction of the act of the 11th of September 1787, an act to empower the supreme executive council to lay out a town and otherwise to apportion the lands contained in the tract of land reserved for the use of the state, &c. In the second section the president or vice-president in council are empowered to cause to be laid out and surveyed a *town in lots*, with a competent and suitable number of *outlots* for the accommodation thereof in the said tract, and to cause to be surveyed and laid out the residue of said tract in lots, the last mentioned lots not to be less than an acre nor more than ten acres each. In the third section, upon the return of the survey, the president, &c. are authorised to sell said lots as they shall deem most to the advantage of the state. That is, after being surveyed, &c. in the manner pointed out in the second section, they are directed to sell them to the best advantage. And in the fourth section the president, &c. are directed to reserve, out of the lots of the town, so much as they shall deem necessary for a court house, jail and market house, for places of public worship, and for burying the dead; and *without* the town, one hundred acres for a common pasture; the streets, lanes and alleys of the lots and outlots are to be common highways forever. The act also directs the manner in which the lots and outlots shall be sold.

The object of the legislature in this plan of sale was to raise as much money as possible for the payment of the public debts, and by annexing this privilege, the lots were enhanced in price. To effectuate the sale and to render the lots more valuable to purchasers, when they direct the survey of the town in lots, they also direct to be annexed thereto, a competent and suitable number of outlots for the accommodation of the owners of the inlots, thereby clearly evidencing

[Carr v. Wallace.]

the intention, that the one should be a mere incident or accessory to the other, attached to it for the purpose of enhancing it's value at the sale. The survey was made, and the town laid out according to the act, and the property was disposed of according to these terms and conditions. In the opinion of the court, by the terms of the contract, the outlots are appurtenant to, or incident to the inlots. They are component parts of the same purchase, and although it is true, as a general rule, that land cannot be appurtenant to land, for a thing corporeal, as is said, cannot be appendant to another corporeal thing, yet this general rule is subject to exceptions. In the Lessee of Hill and others *v.* West, 4 *Yeates* 142, it is ruled that, by a general deed made in 1704, by the first purchase of five thousand acres, with the appurtenances, city lots *incident* thereto, though previously surveyed, will pass together with liberty lands, unless a contrary intention can be shown. It is ruled that the first purchasers held their city lots as appurtenances, or as incident to their purchases of five hundred acres. The intention, that it should be an incident, is not more clearly expressed than in this contract. In the fourth section, the right of common is expressed as appurtenant to the lot in the town, which can be none other than the inlot, to which the outlot is but an incident. It speaks of the lots of the said town, meaning the town of Alleghany, properly so called, and directs that, without the said town, one hundred acres shall be reserved for a common pasture ; and although it does not expressly say for whose use this shall be reserved, yet the reasonable construction is, that it was intended for the use of the owners of the inlots. This construction is strengthened by the patent, which describes the common as the common ground belonging to the town. In the case of the Trustees of the Western University *v.* Robinson, the chief justice says, it would be absurd to suppose that one hundred acres of land, &c. were reserved for the use of all the inhabitants of Pennsylvania. Although it is not absurd to suppose the common to be reserved for the use of the owners of outlots and their alienees, yet such a construction would prove highly inconvenient in process of time, which the legislature must have foreseen, and this is an argument of some weight against the pretensions of the owners of outlots. When the legislature devised this plan, it was supposed to be on a scale abundantly large to accommodate all the inhabitants, and that the outlots would be a great convenience in a variety of ways to the holder of lots within the limits of the town. No idea would seem to have been entertained of its present extent; for if this had been believed, it is not very likely that this common of pasture would have been annexed, either to the inlots or outlots, which, instead of being an accommodation or convenience, may possibly prove, if improperly managed, a public nuisance, and greatly retard the improvement of the town.

It remains now to examine the third and last point.

In the Western University *v.* Robinson, 12 *Serg. & Rawle* 34, it is ruled that the property in the soil remained in the commonwealth,

subject to the right of common, and that if the commoners had re-
leased their right of common, the estate of the commonwealth would
have been absolute. The lot holders might release or modify their
right of common at their will and pleasure. And the proprietors of
the lots would be bound by an acquiescence, which would amount
to a contract, and be equivalent to a release *pro tanto*. It has also
been held, that where leave or license to build a college on a com-
mon is given by a commoner, by parol, he can bring no action for
the encroachment, though no sufficient common is left. 11 *Com.
Law R.* 347. With a full knowledge of their right, the commoners
took the various steps which have been already detailed, to induce
the General Assembly to locate the seminary within the limits of the
town. It seems no other contract was given; but the question is,
whether the conduct of the plaintiffs does not amount to an implied
license to erect the buildings and occupy the grounds, and if any
case can be imagined when such leave or license can be implied,
the case is here presented. After two or three successive public
meetings of the commoners, the legislature, at their request, pass an
act vesting the property in trustees for the use of the seminary.
Having obtained the consent of all persons interested, as was sup-
posed after great pains taken for that purpose, a building is erected
which takes two or three years in the erection. The building is in
the full view of the plaintiff; but during all the time he makes no
manner of objection, nor does he whisper a complaint, although he
is fully aware that they are spending large sums of money under
the belief, not hastily or recklessly formed, that the title was supe-
rior to all exception. What right has the plaintiff, under these cir-
cumstances, to complain of the disturbance of his right of common?
There is no principle better settled, nor one founded on more solid
considerations of equity and public utility, than that which declares
that if one knowingly, though he does it passively by looking on,
suffers another to purchase and spend money on land, under an er-
roneous opinion of title, without making known his claim, he shall
not afterwards be permitted to exercise his legal right against such
person. It would be an act of fraud and injustice, and the conscience
of the plaintiff is bound by the equitable estoppel. Here then would
at least be a negative fraud, in imposing on the defendants by his
silence, for his silence would be treacherously expressive. In equity
when a man has been silent when in conscience he ought to have
spoken, he shall be debarred from speaking when conscience re-
quires him to be silent. No person can doubt that the defendants
supposed they had a good title. They had taken pains to procure
the assent of all the commoners, and supposed they had succeeded.
The plaintiff knew they were expending their money under a delu-
sion, it was therefore his duty to have informed them of his claims.
Having failed to do so, he is estopped in equity from asserting them
now, after the lapse of several years, and after having, by his acqui-
escence, induced the expenditure of large sums of money. But the

[Carr v. Wallace.]

plaintiff replies, that his title was on record, and relies on the cases of Crest *v.* Jack, 3 *Watts* 238 ; 17 *Serg. & Rawle* 383 ; Hepburn *v.* M'Dowell, 2 *Penns. Rep.* 23 ; 2 *Rawle* 93. But the distinction between the cases is very plain. In these cases the person who made the improvements was well aware, or might have informed himself with ordinary care, of the title of the other party. He acted under no delusion, nor was he ignorant of his rights. In Crest *v.* Jack, which is much relied on, Blair was well acquainted with the titles of the respective parties, having acted as an agent of the former owner in receiving the rents. The principle decided in these cases is, that equity will not, on the mere ground of silence, relieve one who is perfectly acquainted with his rights, or who has the means of becoming so, and yet wilfully undertakes to proceed in expending money on the lands of another without obtaining or asking his consent. His ignorance of it is wilful, and he acts at his peril. He has no right to complain, because he is not deceived, or if deceived it is his own fault. He in fact stands in the situation of a wrongdoer. But here no blame of any kind is imputable to the defendant arising either from a persistence in wrong, or from any culpable negligence. They acted under a delusion as to their title, of which the plaintiff was well aware, and of which it would be contrary to equity to permit him to take advantage.

Judgment affirmed.