## PENNSYLVANIA.

41 403
134 645

41 403
217 ¹632

41 403
222 ¹194

---

### EASTERN DISTRICT—PHILADELPHIA 1862.

---

## Chase *versus* Miller.

*Constitutional Law.—" Election Districts" and " Residence" in the Elec·
tion Law defined.—Right of Citizen in Military Service beyond the
Lines of the State to vote at General Election not authorized by the 3d
Article of the Constitution.—Jurisdiction of Supreme Court as a Court
of Error.— Contested Election Case when reviewed on Certiorari.—De-
cree of Quarter Sessions not final in cases of Contested Election.*

1. Jurisdiction is given to the Supreme Court to revise and correct the pro-
ceedings of inferior courts, unless when expressly excluded by statute, or
where a case is stated by the parties wherein they agree to submit their dis-
putes to the Common Pleas, without expressly reserving their right to a writ
of error ; but the errors to be reviewed must appear upon the record.

2. Hence this court has jurisdiction of a contested election on *certiorari*,
where it appears from the record that no facts were in dispute ; for as bills
of exception are not allowed in the Quarter Sessions, no question arising out-
side of the record, can be reviewed, but only the ruling of the court below,
upon questions of law purely.

3. The 155th section of the Act of 2d of July 1839, giving to Courts of
Quarter Sessions, in cases of contested elections, the same powers conferred
on committees of the legislature, to compel the attendance of witnesses, and
the production of·books and papers, is a grant of power for the specific pur-
poses named, but does not make the decree of the Quarter Sessions final and
conclusive, like the report of the committee in a case of contested member-
ship in that body.

4. Election·districts, within the meaning of the Pennsylvania statutes, de-

[Chase *v.* Miller.]

note subdivisions of state territory marked out by known boundaries, pre-arranged and declared by public authority; though not defined by the constitution, they mean in it the same as in the statute, and are recognised as among the civil institutions of the state, which can neither be created nor controlled by the military power.

5. "Residence," in the constitution, is the same as domicil, the place where a man establishes his abode, makes the seat of his property, and exercises his civil and political rights.

6. The right of a soldier to vote under the constitution is confined to the election district where he resided at the time of his entering the military service.

7. The 43d section of the Election Law of Pennsylvania, passed July 2d 1839, allowing soldiers in actual military service to vote, outside of the boundaries of the state, conflicts with the amended clause of the 3d article of the constitution, and is therefore unconstitutional, null and void.

CERTIORARI to the Quarter Sessions of *Luzerne county*.

This was a case of contested election, founded on the complaint of the requisite number of the qualified electors of Luzerne county, setting forth an undue election and false return of Ezra B. Chase to the office of district attorney.

The complaint was filed November 29th 1861, and the time of hearing fixed for the 7th of December following. On the same day a rule was granted by the Quarter Sessions to show cause why the "petition should not be quashed." On the 7th of December the hearing was continued until the 16th, and leave granted to petitioners to amend their complaint. On the 19th of December the rule to quash was discharged, and, on the 24th, the following agreement between the contestants was filed:—

" It is agreed the following facts be submitted as a case stated for the court's decision. Admitted, that of the votes polled within the county of Luzerne, Ezra B. Chase· received 5811 votes, and that Jerome G. Miller received 5646, and that the said number of votes by each received be counted by the court as legal votes.

" That of the votes polled by the volunteers in the army E. B. Chase received 58 votes, Jerome G. Miller received 362 votes. But the legality of the votes polled by the volunteers in the army not being admitted, the question as to the legal effect thereof is submitted as a matter of law for the court. If the court should be of opinion that the army vote is constitutional and legal, the same to be allowed by the court, and added to the votes cast in the county for the party or parties in whose favour they may be, and then the court to decree in favour of the party having the greatest number of votes. If no part of the army vote is received, the decree to be in favour of Mr. Chase, the army vote being taken as above stated, the objections to it being all waived except as to its constitutionality."

On the 6th of January 1862, the court below (CONYNGHAM, P. J.) delivered an elaborate opinion, sustaining the constitution-

[Chase v. Miller.]

ality of the army vote, and decreeing that Jerome G. Miller was duly elected to the office of district attorney of Luzerne county.

The case was thereupon removed into this court by Ezra B. Chase, for whom the following errors were assigned:—1. The court erred in allowing the votes cast by volunteers in the army to be counted as legal and constitutional votes, and in adding the same to the votes cast in the county of Luzerne.

2. The court erred in decreeing that "at the late election for said county, held on the second Tuesday of Octobor last, Jerome G. Miller received six thousand and eight (6008) votes, and that therefore the said Jerome G. Miller had a majority of the votes given for said office, and was consequently duly elected to the same."

3. The court erred in not holding the law authorizing soldiers in service to vote unconstitutional, and therefore void.

The case was argued here by *L. Hakes* and *Stanly Woodward*, for appellant, who contended, 1. That the right to vote was by the constitution, art. 3, § 1, confined to persons who have "resided" in the state one year, and in the election district where they offer to vote ten days immediately preceding the election, and who have paid taxes as therein required; and that if the citizen violate either of these conditions, his right to vote is taken away by his own act: McDaniel's Case, 4 Penn. L. J. 314. That *residence* and *domicil* are synonymous terms: Cooper *v.* Galbraith, 3 Wash. C. C. Rep. 546. That domicil or residence, in its ordinary acceptation, means the place where a person lives, or has his home.

"In a strict and legal sense that is properly the domicil of a person where he has his true, fixed, permanent home and principal establishment, and to which, whenever he is absent, he has the intention of returning."

In the Roman law it is said, there is no doubt but every person has his domicil in that place where he makes his family residence and principal place of his business, from which he is not about to depart unless some business requires; when he leaves it he deems himself a wanderer: Story's Conf. Laws 50, 51.

The seat of the fortune or property which any person possesses in any place constitutes his chief domicil: Pothier.

The French jurists have defined domicil to be ." the place where a person has his principal establishment." Denizart says: "The domicil of a person is the place where a person enjoys his rights, and establishes his abode, and makes the seat of his property."

Kent's Commentaries, note E., p. 431, says: "The place where a man carries on his established business or professional occupation is his domicil, and he has all the privileges, and is bound by all the duties flowing therefrom. The original domicil of the party always continues till he has fairly changed it for another."

[*Chase v. Miller.*]

" It is in the place of his domicil that a man exercises his civil and political rights. Domicil is the place where a person has established his ordinary dwelling :" Bouvier's Inst. 1st vol. 96. Officers, soldiers, and marines of the United States do not lose their domicil while thus employed : Id. 99. See also Guier *v.* O'Daniel, 1 Binn. 352 ; United States *v.* The Penelope, 2 Peters' Adm. Dec. 450. That therefore the several election districts within the proper county are the places and the only places where votes can be received under the Constitution of Pennsylvania.

" That the words ' election district' mean any part of a city or county where its boundaries are fixed by law, within the limits of which the citizens assemble to vote for public officers, whether their authority is local or they are to act in governing the affairs of the state and nation : McDaniel's Case, 4 Penn. L. J. 314 ; and that the 63d section of the Election Law of 1839 adopts the words, and affirms every one of the constitutional requisites.

2. That the legislature have no power to change or dispense with these requisites. That a voter cannot have two domicils, nor can the legislature of Pennsylvania create election districts in other states.

3. If, as must be conceded, the object of this provision was to prevent fraudulent voting, the danger is *at least* as great in the army as at home. The persons who vote there are subject to like passions with those who stay at home. The officers, by whom these elections are held, have not been chosen for this purpose in accordance with or under the sanction of the election laws ; they may never have been residents of the state, or even citizens of the United States. Without the means of testing the qualification of voters, without access to naturalization papers, tax-lists, or any of the tests usually resorted to to prevent illegal voting, the greatest frauds might easily be perpetrated, and the greatest irregularities allowed, which no investigation could ever reach.

Protesting that the framers of the constitution never meant to tolerate such uncertainty in our elections, the court was asked to rescue the people of the Commonwealth from this infraction of their constitutional rights.

*S. P. Longstreet* and *G. M. Wharton,* for appellee.—1. The errors assigned on this *certiorari* being on the facts and merits, cannot be examined into in this proceeding : Derry Overseers *v.* Brown, 1 Harris 390.

It makes no difference how the facts are brought before the court below, whether by agreement of the parties upon the facts to be submitted, or by parol evidence ; the court below having once examined into the merits of the controversy upon the facts,

[Chase *v.* Miller.]

and passed on the same, this court has no power to review their judgment on a *certiorari.* A *certiorari* does not bring up the evidence. The regularity of the proceedings is all that is examinable in this court: Union Canal Company *v.* Keiser, 7 Harris 134.

The power of this court to revise the proceedings of all inferior jurisdictions, extends to the correction of errors on the face of their proceedings, but not to the rejudging of their judgments on their merits. This correctional power extends no further than to keep them within the limits of their jurisdiction, and to compel them to exercise it with regularity: Carpenter's Case, 2 Harris 486; Commonwealth *v.* Nathans, 5 Barr 124; Wallington *et al. v.* Kneass, 3 Harris 313; Mifflin Township *v.* Elizabeth, 6 Harris 17.

The Supreme Court has no jurisdiction to try, on the merits, a contested election of a county or township officer; and a *certiorari* will not lie, even to correct irregularities, in the proceeding of a contested election of this nature. This revisory power has been withheld by the act which is the basis of the proceedings in this case: Act of 2d July 1839, § 155.

The provisions of the Act of Assembly so concurrently point to a definitive sentence, that no words can more closely constitute a tribunal for the final and conclusive determination of a controversy.

An appeal to the Supreme Court never lies from the proceeding of any inferior jurisdiction, specially conferred by statute, unless an appeal be given: Mifflin Township *v.* Elizabeth, 5 Barr. There is no statute authorizing this appeal.

The facts were agreed upon and submitted "as a case stated for the court's decision," without reserving the right to sue out a writ of error. Judgment on a case stated may not be removed by writ of error, unless a right be expressly reserved to sue it out: Carpenter's Case, 2 Harris 488. In the present case the right to sue out a writ of error is not only not reserved, but the Act of Assembly clearly declares that the judgment shall be final.

The facts having been submitted in writing as a case stated for the decision of the court, with an agreement, *inter alia,* that " if the court should be of the opinion that the army vote is constitutional and legal, the same to be allowed by the court, and added to the votes cast in the county for the party or parties in whose favour they may be, and then the court to decide in favour of the party having the greatest number of votes. If no part of the army vote is received, the decree to be in favour of Mr. Chase;" after a patient hearing and full argument, the merits having been regularly passed upon and a definitive opinion rendered, it is not, we respectfully submit, in the power of this court to review the proceedings.

2. The constitutional question has been disposed of by the able

[Chase *v.* Miller.]

opinion of the learned judge before whom the case was argued in the court below.    There is little, if anything, to be added to it.

"A constitution is not to receive a technical interpretation, like a common law instrument or statute."    "It is to be interpreted so as to carry out the great principles of our government, not to defeat them ; and to that end its commands, as to the time or manner of performing an act, are to be considered as merely directory, whenever it is not said that the act shall be performed at the time, or in the manner prescribed, and no other:" Commonwealth *v.* Clark, 7 W. & S. 127.

Under this rule the constitutional provision referred to, will admit of another and more liberal interpretation and construction, one more in keeping with the spirit of our institutions, more consonant with the great principles of our government than the narrow and technical one claimed by the appellant.

The great cardinal principle of our government is based upon the elective franchise, the right of the people to elect their rulers, and to pass upon, at the ballot-box, the merits of their respective candidates for official station.    This principle lies at the foundation of our constitution ; it is the corner-stone of the political edifice ; it is recognised by our customs, and proclaimed by our laws.

The object and intent of the provision relating to the residence of electors, seems very clear and obvious.    The intention of the convention which framed that provision, was not to disfranchise the free white citizens who are otherwise qualified to vote, but to guard against fraud, by designating the district in which or for which their votes should be polled.

It means nothing more than that, in addition to the other qualifications, a citizen shall be resident (that is, domiciled) in his proper election district, ten days or more previous to the day of election ; that his residence must have commenced at least ten days previous.    It is to the time when the residence does commence, that the article more distinctly looks in order to guard against the fraud of surreptitious changes.    If it mean no more than that the residence shall be ten days or more in the proper district, and the domicil of the soldier be unchanged, he would be a qualified voter ; and the legislature may, without conflict with the spirit and intent of the article, fix the place where he may give his vote.    Any other view strikes at the foundation of this great American principle.

It is not necessary that the election should be held in the same district for which the votes are polled ; it may be held elsewhere. In fact, this principle seems to have been generally conceded as it has been acted upon by both the legislature and the courts. The elections for the *township* of Wilkesbarre were for many years held at the old court-house in the *borough* of Wilkesbarre.

[Chase v. Miller.]

The legislature and executive of Pennsylvania followed the same rule of interpretation laid down by Chief Justice Gibson, when, on the 26th of April 1844, they resolved, " That any person who may be constitutionally qualified to vote in any city or county of this Commonwealth, but who may have removed from one ward to another ward within such city, or from any borough or township in such county to any other borough or township in such county, within ten days next preceding any general election held therein, shall be entitled to vote at such general election in the ward, borough, or township from which such person may have so removed."

The Commonwealth v. Hartman, 5 Harris 119, adopts the same rule of interpretation as The Commonwealth v. Clark, 7 W. & S. 127.   There is no clause in the constitution which *prohibits* the legislature from passing a law authorizing soldiers to vote at their respective camps, for the candidates in their respective districts, county, or state, or from establishing temporary election polls for that purpose, and constituting the commanding officers the officers of the election ; and unless prohibited, the power may be exercised.   The constitution furnishes the principle of government, not the rule of action.   It prescribes popular elections, and leaves the legislature to regulate them.   The error of the appellant springs from the attempt to deduce from the constitution not only the principle but the rule of its application.   He seeks to construct a rule by implication that will defeat the legislative regulations, and thereby destroy the very right the constitution intended to guard, viz., the right of suffrage.

3. An election district is not the creature of the constitution but of the statute.   There is nothing in the constitution to prevent the legislature from establishing, for the convenience of the people, different places to receive votes for the same election district, nor is there anything to prevent their establishing, for the convenience of the voters of a district, a place outside of the district for holding the election.   This latter proposition seems to be conceded, and thereby the appellant abandons the doctrine of strict construction, and admits the power of the legislature to go beyond the letter of the constitution, in establishing auxiliary rules to carry into effect its provisions, so long as they do not transcend its spirit.   This right once admitted, we submit, all that is claimed by the appellee must necessarily follow.   Where there is no prohibition found, the execution of a power cannot be deemed unconstitutional, even though it seems to trespass on our ideas of natural justice and right reason : Commonwealth v. McWilliams, 1 Jones 70.   It must be a very clear case to justify the judiciary in setting aside an Act of Assembly as unconstitutional : Commonwealth v. Maxwell, 3 Casey 458 ; The Erie and

[Chase *v.* Miller.]

North East Railroad Company *v.* Casey, 2 Id. 300 ; Kilpatrick *v.* The Commonwealth, 7 Id. 215.

The clause of the constitution relied on provides that persons complying with certain requisites specified shall enjoy the rights of an elector ; but it does not say, not otherwise, nor in any other place than the place specified, shall this right be exercised. It is a peace provision, calculated to operate upon civilians. It neither enlarges or abridges any rights belonging to the soldier as a member of the body politic, or citizen of the Commonwealth. It leaves his rights unimpaired in the hands of the state, who, in the exercise of her attributes of sovereignty, is free to provide such means for securing to him the enjoyments of those rights as the exigencies of the case might demand. This she has done by the passage of the Act of Assembly now under consideration.

4. Why should the brave volunteer be denied the privilege and facilities of voting ? Is he less intelligent, less honest, than those who stay at home ? Is it against the spirit of our institutions that he should have those privileges and facility extended to him, or does public policy demand his disfranchisement ? Why then this attempt to annul the statute securing to him these rights ? Neither the constitution, the spirit of our institutions, nor public policy, demands it.

Legislatures may from time to time provide new remedies, modify old ones, validate defects in form, provide new tribunals or new processes for vindicating existing rights ; and such enactments are perfectly within the limits of the state and national constitutions : Bank of Kentucky *v.* Schuylkill Bank, 1 Parsons 223. And as the appellant holds the domicil of the soldier to be unchanged, as a necessary consequence he would be entitled to vote, and the legislature may, in perfect keeping with both the letter and spirit of the constitution, fix the place where he may give his vote.

The opinion of the court was delivered, May 22d 1862, by

WOODWARD, J.—This is a case of contested election. It comes up to us by writ of *certiorari*. A motion was made and fully argued, to quash the writ on the ground that the decree of the court below is final and conclusive, and that we have no jurisdiction to review it. The first point to be considered, therefore, is our jurisdiction ; for if there be any doubt on that head, we shall be more than willing to escape the constitutional question upon the record.

When the legislature committed contested elections of county officers to the Quarter Sessions, they made them judicial proceedings, and annexed all the usual and necessary incidents of judicial proceedings. Always, contested elections might come under judicial cognisance by *quo warranto*, but in the forms of this case

they are purely statutory, and subject to such rules as the legislature has been pleased to prescribe.   Our appellate jurisdiction in such cases might be taken away altogether by statute, but if it has not been, it must be held to attach, as a necessary judicial incident, in the same manner in which it attaches to other records of the Courts of Quarter Sessions.

For one hundred and forty years the general jurisdiction of this court has been declared by statute to extend to the examination and correction of " all and all manner of error of the justices, magistrates, and courts of the Commonwealth, in the process, proceedings, judgments, and decrees, as well in criminal as in civil proceedings,   *   *   *   *   *   and to minister justice to all persons as full and ample to all intents and purposes as the said court has heretofore had power to do under the constitution and laws of the Commonwealth."   Such are part of the words of the Act of 1836.   In the old Act of 22d May 1722, the powers granted were such as " the justices of the Court of King's Bench, Common Pleas, and Exchequer, or any of them, possessed."   When, therefore, the Act of 1836 refers itself to the " heretofore"· powers of the courts, the general common law powers of the three principal courts of Westminster Hall, so far as they are unimpaired by our constitutions, state and national, are to be understood by the reference.

This is a large charter.   There is no temptation to widen it by judicial construction—the inclination of the judicial mind is rather to narrow it.   But as it is a trust for the people of Pennsylvania, judges have no right, from motives of ease and convenience, to surrender, weaken, or obscure, by judicial refinements, one single one of the powers granted.   The legislature may qualify them, and in a few instances have done so, as in the Justices Act of 1810, where the Courts of Common Pleas are empowered to issue *certioraries* to justices of the peace, and to give judgments thereupon, which shall be final, " and no writ of error shall issue thereon."   In numerous decisions it has been held that these words oust our jurisdiction over judgments rendered by the Common Pleas on *certioraris* to justices of the peace.   The result of the authorities touching the general subject of our appellate jurisdiction, was well stated by the present chief justice, in Gorsline v. Place, 8 Casey, when he said : " The judicial authority of this court extends to the review and correction of all proceedings of all inferior courts, *except where such review is expressly excluded by statute.*"   There is a class of cases in our books which would seem to establish another exception—that of a case stated by the parties, wherein they agree to submit their disputes to the Common Pleas, without expressly reserving their right to a writ of error.   The first of these cases was Fuller v. Trevor, 8 S. & R. 529, which was an amicable reference of a pending cause to

[Chase *v.* Miller.]

referees, subject to the opinion of the court on all legal points and objections. The Court of Common Pleas rendered judgment on the report of the referees, and this court held that a writ of error would not lie to that judgment, because the agreement did not provide that the case should " be considered as of the nature of a special verdict and subject to a writ of error." In Kline *v.* Guthart, 2 Penna. R. 495, which was a reference under the Act of 1705, and a judgment on the award, Gibson, C. J., gave the *rationale* of the ground on which a writ of error is denied to such judgments. He regarded awards as in the nature of verdicts, exceptions to them as motions for a new trial, and judgments upon them as overruling such motions; and inasmuch as writs of error never go to verdicts, nor to mere discretionary exercises of power by the courts, such records are not reviewable here. To the same effect were Wilson *v.* The Commonwealth, 3 Penna. R. 532, and Berg *v.* Moore, 7 Barr 94; whilst Davis *v.* Barr, 5 S. & R. 516, and Kelley *v.* Shoenberger, 7 Watts 394, frequently cited to the same point, are not applicable to it, as any one will see who consults them. If, then, we have an established exception, additional to the one exception stated by the chief justice in Gorsline *v.* Place, it is where a case is referred by agreement of parties to an auditor or referees, without an express reservation of the right of review, and the Court of Common Pleas passes only on exceptions to their report. The presumption of law is, in such cases, that the parties meant to bind themselves by the award of the domestic tribunal of their own providing, and therefore we leave them bound; for, whilst consent of parties cannot confer jurisdiction upon us, it may take it away. I need not allude to another class of cases, such as viewers of land damages and other special statutory tribunals, between whom and this court there is no recognised relation whatever, for these do not fall within the range of the present discussion.

Such, then, in general, is the jurisdiction of this court, to correct all manner of errors of inferior judicial tribunals;—and that is not to be taken away, except by express terms or irresistible implication, has been declared in many cases: Burgenhoffen *v.* Martin, 3 Yeates 479; Overseers *v.* Smith, 2 S. & R. 363; Commonwealth *v.* Beaumont, 4 Rawle 366; Commonwealth *v.* McGinnis, 2 Wh. 113.

But this statement is to be received with a very important qualification—that the errors to be reviewed shall appear on the record. This is necessary to all appellate jurisdictions, where cases come up by writs of error or *certiorari*. The only mode provided by law for bringing evidence or the opinion of an inferior court upon what is technically called "the record," is by a bill of exceptions, sealed and certified by the judge; and, as bills of exception are not allowed in the Quarter Sessions, no question

[Chase v. Miller.]

which arises out of the evidence in that court can be got up into this court. Hence, whilst *certiorari* lies to the proceedings of the Quarter Sessions, in road cases, in pauper cases, in contested election cases, and in other statutory causes committed to the jurisdiction of that court, the writ brings up nothing but what appears upon the record, without a bill of exceptions. Our correctional power extends no farther in such cases than to keep the court within the limits of its jurisdiction, and to see that that is exercised with regularity according to law: Carpenter's Case, 2 Harris 486; Mifflin Township v. Elizabeth, 6 Id. 17; Union Canal Co. v. Keiser, 7 Id. 134; Mauch Chunk v. Nescopeck, 9 Id. 46. And especially is this the rule, where, as in Carpenter's Case, the statute under which the proceeding is had declares that the Common Pleas "shall proceed upon the *merits* and determine *finally* upon the same." Though bills of exception do prevail in the Courts of Common Pleas, the legislature may restrict our jurisdiction, and these words have been held to restrict it in the manner above stated. Neither these words nor any equivalents, however, are found in the Acts of Assembly under which the present case is prosecuted, and we are, therefore, under no special restrictions. The Act of 3d May 1850, Purd. 239, provides that the elections of district attorneys shall be contested and decided in the manner provided for contesting the election of county officers, and by the 153d section of the General Election Law of 2d July 1839, Purd. 300, the Courts of Quarter Sessions have jurisdiction to hear and determine the contested elections of county and township officers— nothing being said about the finality of the courts' decree, as in the act of the same date relating to the election of prothonotaries, &c., under which Carpenter's Case occurred.

But the 155th section of the act under which the present case originated provides that the Courts of Quarter Sessions, when sitting in contested elections, shall have, in addition to their ordinary judicial powers to compel the attendance of witnesses, and the production of books and papers, "all the powers which are conferred upon committees of the legislature by the several provisions of this act." Hence it is argued that the statute meant to make the decree of the Quarter Sessions as final and conclusive as the report of the legislative committee in a case of contested membership of that body. Such, however, is not the meaning of the reference. The reference is, rather, to the provision of the 143d section, which empowers the committee to compel any person, not a legal voter, who voted at the election in question, to declare under oath for which candidate he voted. This was a new and extraordinary power, and, being conferred on a legislative committee, the statute meant, by the reference, to confer the same power on Courts of Quarter Sessions when sitting in contested elections.

[Chase *v*. Miller.]

Having now brought together the several statutes which define and regulate our general jurisdiction in Quarter Sessions cases, it is necessary, next, that we see what this particular case is upon the record, for the extent to which we can review the merits must depend upon how far they appear of record.

Under the Act of Assembly above referred to, an election for district attorney was held in Luzerne county last October, at which Ezra B. Chase and Jerome G. Miller were the candidates. After counting what the return judges considered legal votes, they gave their certificate of election to Chase, but twenty qualified electors filed their complaint in writing, setting forth an undue election, and a false return of Chase, and thus this contest was inaugurated. . Besides complaining of a large number of fraudulent votes cast within the county, the petitioners set forth that " on the day of election certain citizens of the Commonwealth, being qualified electors of the county of Luzerne, and then in the actual military service in certain detachments or companies of volunteers, under a requisition from the President of the United States, and by the authority of the Governor of the Commonwealth, did, agreeably to law, hold an election for the purpose of electing county officers of Luzerne;" and then follows a detailed statement of the votes cast by different companies for the office of district attorney, and a complaint that the return judges excluded the vote of the volunteers, and issued their certificate in disregard of it.

The petitioners did not give the names of the military voters, nor tell the court where they voted. Exceptions were filed to the complaint, one of which was that the place of voting was not disclosed, but the court overruled the exceptions, and refused to quash the complaint or compel it to be amended in this particular.

Pending the proceedings upon this petition, the parties, on the 24th of December, 1861, entered into, and, with the leave of the court, filed of record, a written agreement in these words :

" It is agreed the following facts be submitted as a case stated for the court's decision. Admitted that of the votes polled within the county of Luzerne, Ezra B. Chase received 5811 votes, and that Jerome G. Miller received 5646, and that the said number of votes by each received be counted by the court as legal votes. That of the votes polled by the volunteers in the army, Ezra B. Chase received 58 votes, Jerome G. Miller received 362 votes. But the legality of the votes polled by the volunteers in the army not being admitted, the question as to the legal effect thereof is submitted as a matter of law for the court. If the court should be of opinion that the army vote is constitutional and legal, the same to be allowed by the court, and added to the vote cast in the county for the party or parties in whose favour they may be, and then the court to decree in favour of the party having the

[Chase *v*. Miller.]

greatest number of votes.   If no part of the army vote is received, the decree to be in favour of Mr. Chase, the army vote being taken as above stated, the objections to it being all waived, except as to its constitutionality."

On the 6th of January, the court made their decree "upon the written statement of facts agreed to by the parties, and filed upon the 24th December ultimo, no other evidence being offered," which was to the effect that the army vote was legal, that it should be counted, and that it gave a majority to Miller, to whom the office was awarded.

It has been seen already that the inability of this court to review a decree of the Quarter Sessions on its merits, springs not from any organic defect of jurisdiction, but from the want of a bill of exceptions to certify us of the facts; but no bill of exceptions is needed when the parties agree upon the facts and the court make their agreement a part of the record, and then "thereupon judging," base their decree exclusively on such agreement.   A bill of exceptions compels the facts upon the record.   Neither the court nor the adverse party can resist it, but the parties cannot be compelled to agree, nor the court to admit their agreement to record.   Still both may be done, and thus the purpose of a bill of exceptions fully attained.   The agreed facts become, in such a case, as real a part of the record as if a special verdict had been received and recorded. The court to whom the legislature committed this contested election is provided with a jury which might be used to ascertain facts, and a special verdict is as much legal ground for judgment in the Quarter Sessions as in the Common Pleas.   The parties have come to what is substantially a special verdict by their agreement, and it is wholly immaterial that they did not reserve to themselves a right of review, for not waiving it, the law gave them that.   Had the court possessed itself of the facts *per testes*, whether in the form of oral evidence or by depositions, we could not notice them, simply because there is no mode of certifying to us what the facts were, but, placing them upon the record by the concurrent consent of court, counsel and parties, and then basing the decree most distinctly and exclusively upon the facts so ascertained, it would be hypercriticism run mad to so construe the statutes under which we sit as to deny a citizen the right of review.

If we should limit ourselves strictly to the agreement of 24th December, as the court below did, we should be obliged to say it was wholly insufficient to support the decree that was built upon it, for it does not tell us that the volunteers, who cast what it calls the army vote, were qualified electors of Luzerne county, that they were serving in any detachment or company in pursuance of public authority, who they were, nor where they voted, whether within ten miles of their usual place of voting, or in Virginia or Kentucky.   On all these points the agreement is dumb.   And if

the parties were able to bring before the return judges no better case than is made by that paper, the judges did well to reject the army vote and award the certificate according to votes of whose legality they had some evidence.

But to help out the record we choose to read the agreement in connection with the petition of complaint, and we have already seen that that did set forth, not as fully as it ought, but with tolerable precision, the qualified character of the volunteers who cast the votes in question. By the expression "army vote," in the agreement, we are then to understand the votes alluded to in the petition of complaint. This is absolutely necessary to meet the main question of the cause, for there is nothing in the agreement, in and of itself considered, to raise that question or any other that is worthy of judicial notice.

But even when we construe the agreement by the precedent parts of the record, we cannot learn in what state the votes were cast. The army raised in Pennsylvania has been employed most of the time in other states—though camps of instruction have been maintained within our own state. The reasonable presumption is that the votes denominated the army vote, were cast partly within and partly without our state, and such we have reason to believe was the fact. No account whatever was made of the place of voting in the court below.

The "army vote," as it is most loosely called in the agreement of 24th December, was cast somewhere, and counted in pursuance of section 43d and the sections immediately succeeding of the General Election Law of 2d July 1839, Purd. 289. The 43d section is in these words:—

"Whenever any of the citizens of this Commonwealth, qualified as hereinbefore provided, shall be in any actual military service in any detachment of the militia or corps of volunteers under a requisition from the President of the United States, or by the authority of this Commonwealth, on the day of the general election, such citizens may exercise the right of suffrage at such place as may be appointed by the commanding officer of the troop or company to which they shall respectively belong, as fully as if they were present at the usual place of election : *Provided*, That no member of any such troop or company shall be permitted to vote at the place so appointed, if at the time of such election he shall be within ten miles of the place at which he would be entitled to vote if not in the service aforesaid."

This section and its sequents are virtually a reprint of the Act of 29th March 1813, 6 Smith's Laws, p. 70. The proviso of that Act prescribed two miles from his usual place of voting as the condition on which the volunteer in actual service might exercise suffrage elsewhere. Such a proviso, whether two miles, as in the Act of 1813, or ten miles, as in the Act of 1839, is an intimation

[Chase *v.* Miller.]

of that which we have other reasons for believing, that the legislature of neither of those years had any thought whatever of legalizing military voting outside of our own territorial limits. They probably meant to give the citizen soldier who should be in actual·service within the state on the day of the general election, an opportunity to vote, if his engagements detained him at the prescribed distance from his domicil.   And so understood, there was nothing in the State Constitution, when the Act of 1813 was passed, which its terms could be thought to contravene.   The Constitution of 1790 was then in force, and the qualifications of an elector which that instrument prescribed, were that he should be a freeman of the age of twenty-one years ; that he should have resided in the state two years next before the election, and within that time paid a state or county tax, which should have been assessed at least six months before the election—or he should be a son, between twenty-one and twenty-two years of age, of a citizen qualified as aforesaid.   This was the constitutional rule, and the whole of it, up to January 1st 1839, when the amended Constitution of 1838 took effect; and, therefore, when the revisers of ·our civil code, who were very competent constitutional lawyers, reported in 1834 a general election law, substantially the same that is now in force, they did not hesitate to retain the substance of the Act of 1813.   Had their report been made after the Constitution of 1838, we would scarcely have expected them to incorporate the provisions of the Act of 1813, for, as we shall see hereafter, the Constitution of 1838 made the precise place of voting an element of suffrage.

For five years their report was not taken up by the legislature, and when, near the close of the long session of 1839, it came up, the legislature passed it pretty much in the words submitted by the revisers, without adverting to the changes which in that interval of five years had taken place in our fundamental law.   We are not to wonder at this, for instances of even more careless legislation are not uncommon.   The act was a long one, made up of 157 sections, was not touched until a late day of the session, and was adopted by the two houses on the 25th June—the very day they adjourned.   It was signed by the governor on the 2d July 1839, which gave the act its date.   If, in the hurry of closing a long session of the legislature, any one of the numerous provisions of the act suggested a constitutional doubt to the mind of a single member, he doubtless dismissed it upon faith in the revisers, without remembering that he was called to consider a very different constitutional question from any that engaged their attention.   Tradition tells of no constitutional debates on the Act of 1839 in the legislature that passed it.   I mention these circumstances as showing how inconclusive is the argument which the learned judge below attempted to deduce in favour of the constitutionality of the

5 WR.—27

[Chase *v.* Miller.]

act, from the high character of many of the members of the legislature.

The great question now before us is, whether the 43d section of the act can be reconciled with the 1st section of article 3d of the amended constitution ? Having already quoted the 43d section, I will bring into contrast with it the very terms of the constitutional provision :—

" In elections by the citizens, every white freeman of the age of twenty-one years, having resided in the state one year, *and in the election district where he offers to vote ten days immediately preceding such election,* and within two years paid a state or county tax, which shall have been assessed at least ten days before the election, shall enjoy the rights of an elector. But a citizen of the United States who had previously been a qualified voter in this state, and removed therefrom and returned, and who shall have resided in the election district and paid taxes as aforesaid, shall be entitled to vote after residing in the state six months : *Provided,* That white freemen, citizens of the United States, between the ages of twenty-one and twenty-two years, and having resided in the state one year, and in the election district ten days, as aforesaid, shall be entitled to vote, although they shall not have paid taxes."

By comparing this clause with the corresponding provision of the Constitution of 1790, it will be seen in what the amendments consisted. The word " white" was introduced before " freemen," excluding thereby negro suffrage, which had prevailed to a slight extent. The state residence was reduced from two years to one, and the words requiring a residence in the election district where he offers to vote, were added.

This latter amendment was probably suggested by the registry law, which was passed in 1836, for the city and county of Philadelphia, the main object of which was to identify the legal voter, before the election came on, and to compel him to offer his vote in his appropriate ward or township, and thereby to exclude disqualified pretenders and fraudulent voters of all sorts. The idea of a registry of legal voters as means to purity of elections was hinted by Ch. J. Tilghman in 1816, in Catlin *v.* Smith, 2 S. & R. 266. When the third article came up in the Convention of 1838, the political party who had favoured the Philadelphia registry law brought forward and supported this amendment as calculated to accomplish substantially the same results for the whole state which the registry law proposed to accomplish for Philadelphia. The political party to whom the registry law had always been distasteful, opposed the amendment as an unnecessary clog upon freedom of suffrage, but on a division it was adopted by a vote of sixty-four to sixty, every member from the city of Philadelphia, where the registry law had proved acceptable, voting for it, and

[Chase *v.* Miller.]

every member from the county of Philadelphia, which had never relished the registry law, voting against the amendment: Con. Deb. vol. ix., p. 300, *et seq.*

Regarding the amendment as designed in general to exclude fraudulent voting, the question now is, what construction shall be given to its particular phraseology? Construing the words according to their plain and literal import (and we must presume that the people of Pennsylvania construed them so when they adopted the amendment), they mean, undoubtedly, that the citizen, possessing the other requisite qualifications, is to have a ten days' residence in an election district, and is to offer his ballot in that district. The second section of this article requires all popular elections to be by ballot. To "offer to vote" by ballot, is to present oneself, with proper qualifications, at the time and place appointed, and to make manual delivery of the ballot to the officers appointed by law to receive it. The ballot cannot be sent by mail or express, nor can it be cast outside of all Pennsylvania election districts and certified into the county where the voter has his domicil. We cannot be persuaded that the constitution ever contemplated any such mode of voting, and we have abundant reason for thinking that to permit it would break down all the safeguards of honest suffrage. The constitution meant, rather, that the voter, *in propria persona,* should offer his vote in an appropriate election district, in order that his neighbours might be at hand to establish his right to vote if it were challenged, or to challenge if it were doubtful.

The amendment so understood, introduced not only a new test of the right of suffrage, to wit, a district residence, but a rule of voting also. Place became an element of suffrage for a two-fold purpose. Without the district residence no man shall vote, but having had the district residence, the right it confers is to vote in *that district.* Such is the voice of the constitution. The test and the rule are equally obligatory. We have no power to dispense with either. Whoever would claim the franchise which the constitution grants, must exercise it in the manner the constitution prescribes.

But, be it observed, the constitution does not define an election district, and therefore I hold that it referred the definition to the legislature. The words "election district," do not occur in the Constitution of 1790. The word "district" was often applied by that instrument to subdivisions of the state for senatorial, representative, and judicial purposes, but never for purposes of general elections. Election districts acquired their first constitutional recognition in 1838. They had, however, long been familiar to our ordinary legislation. "When any township or townships hath or have been divided, or hereafter shall be divided, in forming any *election district,* an inspector shall be chosen for each dis-

[Chase *v.* Miller.]

trict," said the 7th section of the Act of 15th February 1799 (3 Smith's Laws 340), and since that time we have had innumerable Acts of Assembly creating, dividing, and subdividing election districts, until the legislature grew tired of the subject, and, in 1854, turned it over to the Courts of Quarter Sessions, to fix election districts, "so as to suit the convenience of the inhabitants thereof:" Purd. 1069. Always, from 1799 down to the present hour, election districts, within the meaning of our statutes, have denoted subdivisions of Pennsylvania territory, marked out by known boundaries, prearranged and declared by public authority. Whether composed, as at different periods they have been, of counties, or cities, or townships, or boroughs, of wards or of precincts, they have always been such subdivisions of our own territory, and no man has ever been known to suggest the formation of an election district by Pennsylvania authority outside of her state borders. Now, whilst the constitution did not stop to define election districts, it took up and incorporated them as the legislature had theretofore or should thereafter define and regulate them. It referred itself to the legislative will on the subject. And, therefore, election districts mean in the constitution just what they mean in the statutes. This necessary dependence of constitutional principles upon auxiliary legislation was explained in Maxwell's Case, 3 Casey 444. We must understand the constitution, then, as prescribing to the qualified voter, that his ballot is to be cast in such an election district as the legislature may erect by itself or through the courts. And the legislative power over election districts is unlimited within our own state. Whether they could form a district *beyond* our territorial jurisdiction for the convenience of our own citizens, is a question which need not be considered, for no such legislation has been attempted. But it is quite clear to our minds that the legislature might erect a military camp within the state into an election district, and the moment they should do so the constitution would apply itself to that district in the same manner as to any other.

But there must not only be a district to vote in, but there must be a *residence* therein for ten days next preceding the election. This is a part of the condition of suffrage. Undoubtedly the primary signification of the word "residence," as used in the constitution, is the same as domicil—a word which means the place where a man establishes his abode, makes the seat of his property, and exercises his civil and political rights, but I am not satisfied that the constitution meant to limit itself to this strict and technical definition of residence. Referring the subject of election districts to the legislature, as we have seen that it did, I incline strongly to think that the constitution meant, also, to leave the subject of residence in an election district to legislative discretion, and, therefore, that the legislature are as free to declare

[Chase v. Miller.]

what shall be residence in an election district for ten days next preceding the election, as they are to prescribe the boundaries of the district. When they have not exercised their power nor attached to the word any other than its ordinary legal signification, it is to be received according to its primary meaning in the constitution, as equivalent to domicil. But if they should make a military camp in Pennsylvania an election district, and declare that military sojourn and service therein for ten days should be equivalent to a constitutional residence for the purposes of election, I would be extremely loth to think such a law unconstitutional. These observations, however, on the meaning of the word residence, must not be considered as expressing the opinion of the court, but only my own.

The meaning of the constitutional clause under consideration may, therefore, on the whole, be stated thus—every white freeman, twenty-one years of age, having "resided" according to the primary meaning of that word, or according to legislative definition of it, in any "election district" created by or under the authority of the legislature, for ten days preceding the election, shall be permitted to offer his ballot in that district.

Having now defined, with all possible clearness, the meaning we attach to the clause of the constitution in question, we turn next to the consideration of the meaning of the 43d section of the Act of 1839. Like all other parts of a statute, it is to be construed, if possible, in a manner that shall be consistent not only with the constitution, but with the other parts of the same statute. Neither unconstitutionality nor repugnancy are to be assumed, but, if both clearly appear, we ought not to be expected to give the section effect.

The section says that the citizens referred to in its first clause " may exercise the right of suffrage *at such place* as may be appointed by the commanding officer of the troop or company to which they shall respectively belong."

Now we have seen above that the constitution prescribes a *place* for the exercise of the right of suffrage, to wit, an election district. The 43d section does not affect to create an election district. There is not a word in it for that purpose. There is no designation of boundaries, no subdivision of territory, nothing, not a word or thought which bears the slightest relation to our legislation on the subject of election districts. But it is said the place which the commanding officer is authorized to appoint is the substantial equivalent of an election district. Not so for many reasons, for these two particularly: 1st. There is no prior public designation of the place. One purpose of having election districts designated on some public record is, that all parties interested may know where to resort to find the ballot-box. Some go there to vote— others to watch for illegal votes—others to electioneer, but all

[Chase *v.* Miller.]

have an interest in knowing where the law of the land has directed the election to be held. The military commander makes no public proclamation of the place he appoints, no record exists of his appointment. 2d. A second and perfectly conclusive reason why the place fixed by the commander cannot be regarded as an election district is, that the legislature have no power to authorize a military commander to make an election district. It is a part of the civil administration—this designating of election districts—and however it may be committed by one of the three co-ordinate departments of the government to another of those departments, as by the legislature to the judiciary, no civil functions of either department can be delegated to a military commander. This would be to confound the first principles of the government. If the legislature had said in the most express terms that the commander might declare his camp, wherever it might happen to be, an election district, it could have availed nothing, for the constitution, in referring to the legislature for election districts, recognised them as among the *civil* institutions of the state, to be created and controlled exclusively by the civil, as contradistinguished from the military power of the state. The constitution says "the military shall, in all cases and at all times, be in strict subordination to the civil power," which is marking a distinction between the two powers with great emphasis. To the civil and not to the military power did the constitution intrust the formation of election districts, and therefore the civil cannot commit it to the military.

If, then, the legislature did not and could not authorize the military commander to form an election district, how could there be any constitutional voting under the 43d section? Without an election district there can be no constitutional voting. The 43d section provides for no election district, and no military commander can be empowered to form one—hence it follows, as an inevitable deduction, that the "place" referred to in that section is inconsistent with the constitutional requisition of an election district, and that whatever votes have been cast in pursuance of that section since the Constitution of 1838 came in, have been cast without authority of law. If the place of voting has been, as in many instances we know it has been in other states, and in the District of Columbia, the assumptions set up in behalf of it have only been the more extravagant. For, observe, it has first been assumed that the constitution was intended to have extraterritorial effect; next, that the legislature had power to make election laws to be executed not only in Pennsylvania, but in other states; then that the 43d section established election districts wherever a commander of a troop or company should be pleased to appoint; and finally, that the presence of the soldier-voter at that place— though it might be on a forced march or in the tug of battle—was

*residence* for ten days within the meaning of the constitution, no word of legislation having ever said it should be so considered. Nay, not only had no legislation authorized this last assumption, but this very 43d section had excluded it by declaring that the soldiers entitled to vote at the places appointed by military commanders should be "*qualified citizens*."

A constitutional argument which rests on such assumptions can never be formidable. When a soldier returns to his election district, he resumes all the civil rights of citizenship, and, his residence being unimpaired by his temporary absence, he has a right to vote on election day ; but under the constitution, to which his fealty is due, he can acquire no right to vote elsewhere, except by a change of residence from one district to another.

The repugnancy of the 49th section to other sections of the same statute is as gross as its inconsistency with the constitution. It says, the "citizens of this Commonwealth qualified as *hereinbefore* provided," shall have the peculiar right of suffrage, which is claimed in this case to be constitutional. This word "hereinbefore" is a reference to prior sections of the same statute, but the qualifications for suffrage are not contained in any prior section— another instance of careless legislation. It is not till we get to the 63d section that we come to the subject of qualifications. The 63d section re-enacts the 1st section of the third article of the constitution in terms. If we read the word hereinbefore as if it were written hereinafter, or if we construe it as referring to the constitutional clause of qualification (and in one or the other of these ways it must be taken), it comes to the same thing—*a demand for the constitutional qualifications of suffrage in every soldier who claims to vote under the 43d section.* It says, in effect, that the soldiers who offer to vote in the election district wherein they have resided ten days immediately preceding the election, shall be entitled to vote in any place their commander appoints, provided it be not within ten miles of the district wherein they have resided for the last ten days—which is downright nonsense. Yet such is the effect of the words " qualified as hereinbefore provided" when taken in connection with the other parts of the section—they turn the whole section into jargon.

The 63d section declares, that " no person shall be permitted to vote at any election" provided for by the act, except he possess the constitutional qualifications which have been already expounded. The 67th section declares that every person qualified as aforesaid " shall be admitted to vote in the township, ward, or district in which he shall reside," and the resolution of 26th April 1844, put down in Purdon as § 48 of the act, provides for a person who removes from one ward, borough, or township to another within ten days before the election, and gives him a right to vote

in the ward, borough, or township from which he has removed. These legislative regulations of residence in districts are in accordance with that interpretation of the constitution suggested above, and show clearly how essentially the *place of voting* has entered into the qualifications of suffrage. The negative words of the 63d and the affirmative words of the 67th are very emphatic expressions of the constitutional rule in respect to the place of voting..

Whilst speaking of the legislative control of election districts it may be proper to advert to a fact, stated in argument, that voters resident in the township of Wilkesbarre, which is an election district, are accustomed to vote in the borough of Wilkesbarre, which is a separate election district, and other similar instances are said to exist in Luzerne county, where votes are actually cast in an election district adjacent to that in which the electors reside. If this practice have the sanction of an Act of Assembly, it is defensible; if it have not, I know of no principle on which it can be excused except that of *communis error.* And this is all that we feel called on to say in regard to it, for it is not a circumstance of sufficient magnitude or importance to disturb the course of our argument, or to attract further notice.

To all these sections the 43d, as construed in the court below, is directly repugnant. It is repugnant, also, to all those numerous provisions of the act which require peace officers, on demand of an election officer, or of three citizens, to preserve free access to the polls, and to suppress disturbances and riot; which forbid wagering and misconduct at the polls, and which prohibit all troops, "either armed or unarmed," from attending at any place of election within the Commonwealth. The 43d section is in direct antagonism to all of these reasonable and conservative provisions. It permits the ballot-box, according to the court below, to be opened anywhere, within or without our state, with no other guards than such as commanding officers, who may not themselves be voters, nor subject to our jurisdiction, may choose to throw around it; and it invites soldiers to vote where the evidence of their qualifications is not at hand; and where our civil police cannot attend to protect the legal voter, to repel the rioter, and to guard the ballots after they have been cast.

It is scarcely possible to conceive of any provision and practice that could, at so many points, offend the cherished policy of Pennsylvania in respect to suffrage. Our constitution and laws treat the elective franchise as a sacred trust, committed only to that portion of the citizens who come up to the prescribed standards of qualification, and to be exercised by them at the time and place and in the manner prearranged by public law and proclamations; and whilst being exercised, to be guarded, down to the instant of its final consummation, by magistrates and constables, and by

oaths and penalties.   All of which the 43d section reverses and disregards, and opens a wide door for most odious frauds, some of which have come under our judicial cognisance.   It is due to our citizen soldiery to add, however, in respect to the cases of fraud that have been before us, that no soldier was implicated.   The frauds were perpetrated, in every instance, by political speculators, who prowled about the military camps watching for opportunities to destroy true ballots and substitute false ones, to forge and falsify returns, and to cheat citizen and soldier alike out of the fair and equal election provided for by law.

And this is the great vice of the 43d section—that it creates the occasion and furnishes the opportunity for such abominable practices.   This would be a reason, drawn from our experience of the last half year, for construing it strictly, if strict construction were required.   But it is so palpably in conflict with the constitution, and so repugnant to all the substantial parts of the enactment into which it was heedlessly thrust, that no strictness of construction is called for.   Taking the section as it stands — as every reader, whether clerk or layman, would understand it, or as the learned judge below administered it—we hold it to be subversive of the amended clause of article 3d of the constitution, and also of the constitutional sections of the General Election Law of 2d July 1839.

Having now examined fully the grounds and extent of our jurisdiction, and having stated the meaning of both the constitutional amendment and the enactment in question, and thus developed the irreconcilable antagonism between them, it remains only that we notice, briefly, some of the most prominent arguments that have been urged in support of the enactment.   The learned judge refers himself to several cases, in which this court have set up judicial implications as to the spirit and meaning of the constitution, in order to support Acts of Assembly that were inconsistent with the letter of the constitution, but he failed to observe that, in all these cases, there was *ground laid in the constitution itself* to support the judicial implication.   Take for example the Acts of Assembly that were discussed in Zephon's Case, 7 W. & S. 68, Kilpatrick's Case, 7 Casey 178, and Foust's Case, 9 Id. 340, all of which were supposed to conflict with that provision of the constitution which requires the president judge of the Common Pleas to be one of the quorum of the Court of Oyer and Terminer. Everybody knows that the constitution betrayed an anxiety that the trial of high crimes should be presided over by a judge "learned in the law," and as it provided for no such judges, except in the instance of the president of the Common Pleas, it, therefore, required *him* to be present in the court of highest criminal jurisdiction.   But when the legislature provided associate judges "learned in the law," for certain Courts of Common Pleas,

[Chase *v.* Miller.]

everybody saw how the overruling purpose of the constitution would be just as well carried out by allowing such associates to constitute the Oyer and Terminer, as by requiring the president judge to be always present. Founding the judicial implication on the manifest intent and purpose of the constitution, the Acts of Assembly were held constitutional.

So, in the instance discussed in Maxwell's Case, 3 Casey 444, the choice of judges by popular election was seen to be the policy and purpose of the constitution, but the constitution could not regulate the details of such an election, and therefore referred them to the legislature to regulate. The legislature, considering that three months was none too much time for the people to look up a good judge, provided that if a vacancy occurred in less than that time before the annual general election, the choice should be postponed till the general election of the next year—the vacancy being filled, meantime, by executive appointment. We held the Act of Assembly constitutional, because it aimed at the accomplishment of one of the great and apparent purposes of the constitution. We could not consider the interval of three months unreasonable, because it was the very period which the constitution itself fixed, for the election of a governor when a vacancy happened in that office in the midst of an official term. Thus. the grounds of the judicial implication set up in support of the law were derived from the constitution itself. The same line of remark might be applied to most, perhaps all, of the other cases cited.

But how can it be applied to this case? In what part of the constitution does it betray the purpose, policy, or desire, that votes should be cast wherever qualified citizens may happen to be on election day? So far from affording any ground for judicial implications of this kind, it studiously excludes them by prescribing the terms of suffrage with as much precision as we would look for in a treatise on mathematics. It does not deal with suffrage carelessly. It withholds it altogether from about four-fifths of the population, however much property they may have to be taxed, or however competent in respect of prudence and patriotism, many of them may be to vote. And here let it be remarked, that all our successive constitutions have grown more and more astute on this subject. Penn's frame of government, made in April 1682, gave the right of suffrage to "every freeman of the province;" his laws, agreed upon in England in May 1682, gave it to every inhabitant of the province who should purchase a hundred acres of land, or who shall have paid his passage, and taken up a hundred acres of land at a penny an acre, and cultivated ten acres thereof; and to every person that hath been a servant or bondsman, and is free by his service, that shall have taken up fifty acres, and cultivated twenty, and to every resi-

[Chase v. Miller.]

dent of the province that pays scot and lot to the government. By the Constitution of 1776, every freeman, of twenty-one years of age, having resided in the state one year next before the election, and paid public taxes during that time, was entitled to vote.

Here we see the definition of a voter growing more exact, and in the Constitution of 1790 still more exact, and, finally, in that of 1838, he is to superadd to the other distinguishing marks, a district residence of ten days immediately preceding the election. Now the labour of the constitution has not been to restrict suffrage in any spirit of distrust of popular intelligence, but it has been to define it so exactly that it might be preserved from abuse and perversion. The constitution affords ample ground for judicial implications in favour of legislation that tends to ascertain legal voters and votes with precision and exactitude, but not an atom of ground for implications in behalf of a law that opens the ballot-box anywhere and everywhere, under supervision of military officers wholly unknown to our civil administration, and where no officer can possibly be who is specially charged with the supervision of state elections. Because judicial implications have been set up in behalf of other Acts of Assembly, it does not follow that judicial implications can save this one. In other instances the implication was well grounded in the constitution—in this instance everything in the constitution forbids the implication.

The learned judge deprecates a construction that shall *disfranchise* our volunteer soldiers. It strikes us that this is an inaccurate use of language. The constitution would disfranchise no qualified voter. But, to secure purity of election, it would have its voters in the place where they are best known on election day. If a voter voluntarily stays at home, or goes a journey, or joins the army of his country, can it be said the constitution has disfranchised him? Four of the judges of this court, living in other parts of the state, find themselves, on the day of every presidential election, in the city of Pittsburgh, where their official duties take them and where they are not permitted to vote. Have they a right to charge the constitution with disfranchising them? Is not the truth rather this—that they have voluntarily assumed duties that are inconsistent with the right of suffrage for the time being? Such is our case, and such is the case of the volunteers in the army. The right of suffrage is carefully preserved for both them and us, to be enjoyed when we return to the places which the constitution has appointed for its exercise. It is forcing a gratuitous assumption upon the constitution to treat it as intending that the volunteer in the public service, shall carry his elective franchise with him wherever his duties require him to go. There is no word or syllable in the instrument to justify the assumption.

A good deal has been said about the hardship of depriving so meritorious a class of voters as our volunteer soldiers of the right

[Chase *v.* Miller.]

of voting. As a court of justice we cannot feel the force of any such consideration. Our business is to expound the constitution and laws of the country as we find them written. We have no bounties to grant to soldiers, or anybody else. It may be said, however, in answer to this suggestion, that the hardship of missing an annual election is one of the least the soldier is called on to endure, and this they share in common with the patriot soldiers of all the loyal states, for it is understood that no state but Pennsylvania has attempted to extend civil suffrage to an army in the field. To voluntarily surrender the comforts of home, and friends, and business, and to encounter the privations of the camp and the perils of war, for the purpose of vindicating the constitution and laws of the country, is indeed a signal sacrifice to make for the public good, but the men who make it most cheerfully and from the highest motives, would be the very last to insist on carrying with them the right of civil suffrage, especially when they see, what experience proves, that it cannot be exercised amidst the tumults of war without being attended with fraudulent practices that endanger the very *existence* of the right. Whilst such men fight for the constitution, they do not expect judges to sap and mine it by judicial constructions.

Finally, let it be said that we do not look upon the construction we have given the constitutional amendment as stringent, harsh, or technical. On the contrary, we consider it the natural and obvious reading of the instrument, such as the million would instinctively adopt. Constitutions, above all other documents, are to be read as they are written. Judicial glosses and refinements are misplaced when laid upon them. Carefully considered judicial implications may indeed be made from them in support of statutes—never to defeat statutes—when such implications are grounded in the constitution itself, and tend to accomplish its obvious purposes, as well as to promote the public welfare. But when asked to set up a construction that opposes itself to both the letter and the spirit of the instrument, and which tends to the destruction of one of our fundamental political rights—that free and honest suffrage on which all our institutions are built—this court must say, in fidelity to the oaths we swore, that it cannot be done.

> DECREE.—And now, to wit, May 22d 1862, this cause having been argued by counsel, and fully considered by the court, the motion made on behalf of the contestants to quash the *certiorari* is overruled and dismissed, and it is ordered and adjudged that the decree of the Court of Quarter Sessions of the county of Luzerne made on the 6th day of January 1862 be reversed, annulled, and taken for nought, and it is here determined and decreed, that the election and

[Chase *v.* Miller.]

return of Ezra B. Chase to the office of District Attorney in and for said county of Luzerne, at the general election on the second Tuesday of October last, was not undue or false, as charged by said contestants, but that the said Ezra B. Chase was duly elected to said office, and is entitled, upon taking the proper oath, to all the rights, privileges, and emoluments thereof.

It is further considered and certified that the complaint of said contestants was not without probable cause, and it is therefore decreed that the county of Luzerne pay the costs of this contested election.

THOMPSON, J., dissented.