The People of the State of New York ex rel. John Lard-
    ner and John Lardner, Appellants, v. Samuel A. Carson,
    Respondent.

1. Elections — Voter's Election District — Constitutional Pro-
hibition of Voting Elsewhere.  The word "elsewhere," in the consti-
tutional provision that an elector must vote "in the election district of
which he shall at the time be a resident, and not elsewhere" (Const. art. 2,
§ 1), means some other election district polling place than that for the
election district in which the voter resides.

2. Polling Place for District.  All that the Constitution requires is
that the elector must vote at the polling place designated by law for cast-
ing the vote of the district where he resides, and the validity of his vote
is not affected by the circumstance that the place is located outside the
boundary line of the district.  When he does that, he votes in the district
of his residence and not elsewhere, within the purview of the Constitution.

3. Polling Place for Town in City — Power of Legislature to
Authorize.  A polling place in a city for a town outside the city, at
which residents of the town only and not residents of the city are allowed
to vote, can be established or authorized by the legislature; this is not
prohibited by the constitutional provision that an elector must vote "in
the election district of which he shall at the time be a resident, and not
elsewhere."

*People ex rel. Lardner* v. *Carson*, 86 Hun, 617, affirmed.

(Submitted March 15, 1898; decided April 19, 1898.)

APPEAL from a judgment of the late General Term of the Supreme Court in the fifth judicial department, entered June 27, 1895, affirming a judgment in favor of defendant entered upon a decision of the court on trial at Circuit, a jury having been waived.

The nature of the action and the facts, so far as material, are stated in the opinions.

*Washington H. Ransom* for appellants. So much of section 18 of title 9 of chapter 365 of Laws of 1865, and section 269 of chapter 120 of Laws of 1886, as authorize the inhabitants of the town of Lockport to vote at general elections at polling places situated in the city is repugnant to the spirit and letter of article 2, section 1, of the State Constitution. (*People ex rel.* v. *Bd. Canvassers*, 129 N. Y. 394; *People ex rel.* v. *Pease*, 27 N. Y. 45; *Williams* v. *Potter*, 3 N. E. Rep. 729; *Chase* v. *Millar*, 41 Penn. St. 403; L. 1865, ch. 365; *Matter of El. Inspect.*, 2 Penn. Dist. Reps. 299; *Peard* v. *State*, 51 N. W. Rep. 828.) The clause in question is unconstitutional, being repugnant to section 16 of article 3 of the Constitution. (*People* v. *O'Brien*, 38 N. Y. 193; *Huber* v. *People*, 49 N. Y. 132; *People ex rel.* v. *Hills*, 35 N. Y. 449; *Astor* v. *Arcade R. Co.*, 113 N. Y. 93; *Johnston* v. *Spicer*, 107 N. Y. 185; *Tingue* v. *Vil. of Port Chester*, 101 N. Y. 294; *Coxe* v. *State*, 144 N. Y. 396, 408; *Matter of Sackett, D. & De G. Sts.*, 74 N. Y. 95.) Even if the clause in question be held not obnoxious to the Constitution, it was repealed by chapter 680 of the Election Law of 1892. (*People ex rel.* v. *Bd. Canvassers*, 129 N. Y. 395; L. 1890, ch. 262, § 45; *Matter of City of Buffalo*, 18 N. Y. Supp. 771; *Matter of N. Y. Inst.*, 121 N. Y. 234; *Matter of Dobson*, 146 N. Y. 357; *Matter of W. S. A. & P. R. R. Co.*, 115 N. Y. 442; *Heckman* v. *Pinkney*, 81 N. Y. 111; *D. & L. P. R. Co.* v. *Allen*, 16 Barb. 15; *People* v. *G. & S. T. Co.*, 98 N. Y. 67; *Cromwell* v. *MacLean*, 123 N. Y. 474, 484; *Anderson* v. *Anderson*, 112 N. Y. 104, 111.) The fact that the town people had their polling places and have voted within the city

since 1865, does not help the defendant. (*People ex rel. v. Allen*, 42 N. Y. 378; *People ex rel. v. Thacher*, 55 N. Y. 525; *People ex rel. v. Pease*, 27 N. Y. 45; *People v. Cook*, 8 N. Y. 67; *People ex rel. v. Van Slyck*, 4 Cow. 297.) That the voters of the town of Lockport might be disfranchised should have no effect on the decision. (*People ex rel. v. Bd. Canvassers*, 129 N. Y. 360; *People ex rel. v. Bd. Canvassers*, 129 N. Y. 395; *People ex rel. v. Pease*, 27 N. Y. 45, 56; *Montgomery v. Odell*, 67 Hun, 169.) The fact that the term has expired and the defendant is out of office should not deprive the plaintiffs of a decision of the case. (*People ex rel. v. Loomis*, 8 Wend. 396; *People ex rel. v. Seaman*, 5 Den. 409; *People ex rel. v. Pease*, 27 N. Y. 45; *Matter of South Market St.*, 67 Hun, 594; *Stuart v. Palmer*, 74 N. Y. 183.)

*Charles Hickey* for respondent. Chapter 365 of the Laws of 1865, and chapter 120 of the Laws of 1886, are not in violation of section 1 of article 2 of the State Constitution. (L. 1847, ch. 240, § 15; L. 1892, ch. 680, § 8; Dillon on Mun. Corp. [3d ed.] 214–216; *North Hempstead v. Hempstead*, 2 Wend. 109; *Ex parte McCollum*, 1 Cow. 563; *People v. Morrell*, 21 Wend. 563; L. 1894, ch. 639; *People ex rel. v. Dayton*, 55 N. Y. 367; *People v. Stephens*, 13 Hun, 22; *People v. Wilmerding*, 42 N. Y. S. R. 143; *Matter of Lorillard*, 36 N. Y. S. R. 231; *Matter of Comstock*, 25 N. Y. S. R. 616; *Matter of W. S. A. & P. R. R. Co.*, 115 N. Y. 447; *Easton v. Pickersgill*, 55 N. Y. 310.) Appellant's contention that the clause in the charter of the city of Lockport permitting the inhabitants of the town of Lockport to hold their town meetings and general elections within the city is unconstitutional, in that it does not meet the requirements of article 3 of section 16 of the Constitution, is without force. (*Matter of Knaust*, 101 N. Y. 194; *People ex rel. v. Briggs*, 50 N. Y. 553; *Matter of Mayer*, 50 N. Y. 504; *Matter of Dept. of Public Parks*, 86 N. Y. 437; *Matter of Upson*, 89 N. Y. 67; *Bd. Water Comrs. v. Dwight*, 101 N. Y. 9; *Van Brunt v. Town of Flatbush*, 128 N. Y. 50; *W. I. B. Co. v. Town of Attica*,

119 N. Y. 204; *Matter of Mayor, etc.*, 99 N. Y. 569; Dillon on Mun. Corp. [3d ed.] 214–216; *North Hempstead* v. *Hempstead*, 2 Wend. 109; *Ex parte McCollum*, 1 Cow. 550; *People* v. *Morrell*, 21 Wend. 563.) Appellant's contention, that the clause in question was repealed by chapter 680 of the Laws of 1892, is without force for the reason that section 168 of said chapter specifies what laws are thereby repealed, and does not include the acts authorizing the town elections to be held in the city. (*Mark* v. *The State*, 97 N. Y. 572; *Van Denburgh* v. *Vil. of Greenbush*, 66 N. Y. 1; *Matter of Comrs. Central Park*, 50 N. Y. 493; *People* v. *Quigg*, 59 N. Y. 83; *Matter of Brown* v. *Duane*, 60 Hun, 98; *People ex rel.* v. *Myers*, 33 N. Y. S. R. 18; *Buffalo C. Assn.* v. *City of Buffalo*, 118 N. Y. 61; *Aldinger* v. *Pugh*, 57 Hun, 181; *Bergman* v. *Wolff*, 33 N. Y. S. R. 499.) The judgment should be affirmed for the further reason that plaintiffs are estopped from claiming that the votes of the electors of the town of Lockport are nullities and should not be counted. (*People* v. *Flanagan*, 66 N. Y. 237; Bigelow on Estoppel, 276; *Carver* v. *Astor*, 4 Pet. 187; *Penrose* v. *Griffith*, 4 Binn. 231; *Nicto* v. *Carpenter*, 7 Cal. 527; *Morgan* v. *Hallett*, 27 Ala. 699; *Matter of Cooper*, 93 N. Y. 507; *Embury* v. *Conner*, 3 N. Y. 511; *Rusk* v. *Soutter*, 67 Barb. 371; *Anderson* v. *Reilly*, 66 N. Y. 189.) The judgment should be affirmed for the reason that the term of office which is in dispute expired more than a year ago, so that respondent cannot be ousted therefrom. (*Matter of Manning*, 139 N. Y. 446; *People ex rel.* v. *Com. Council of Troy*, 82 N. Y. 575; *Bryant* v. *Thompson*, 128 N. Y. 426; *People ex rel.* v. *Phillips*, 67 N. Y. 582; *People ex rel.* v. *Walter*, 68 N. Y. 408.) The judgment should be affirmed for the further reason that neither the Constitution nor the statutes of the state provide that an election, in other respects regular, shall be void because not conducted within the territorial limits of the district for which it is held, or because there may be some doubt as to whether it was held in such district or out of it. (*Ex parte Heath*, 3 Hill, 42.)

O'BRIEN, J. The purpose of this action was to oust the defendant from the office of superintendent of the poor of the county of Niagara, and to install in that office the relator, who is the real plaintiff in the action. The relator claims that he was elected to that office at the general election held in November, 1892, and that the defendant is an intruder. The term of the office has long since expired, and all the effect our decision can have is possibly to lay the foundation of another suit by the relator for the salary.

There is no dispute about the facts. Of the votes cast at the election the defendant received a majority of eight, and it may be assumed that the closeness of the vote is what provoked this litigation. There is no claim that any fraud or wrong was committed by any one. It is not even suggested that any one voted for the defendant that was not entitled to vote, or that any one was prevented from voting for the relator who desired so to vote.

The contention of the relator is based upon about as narrow a point as ever before entered into a contest for a public office. The total vote for the office was 13,502, of which the defendant received 6,755 and the relator 6,747. But of this total vote 514 votes were cast in the town of Lockport, and the relator's whole case rests upon the proposition that these votes were illegal and void. It is admitted that every one of them was cast by a qualified elector residing in that town, and that 178 of them were cast and counted for the relator. But since 336 of them were cast and counted for the defendant, that is supposed to be the weak point, and the only weak point, in his title to the office. The only objection made, or that it is possible to make, to these votes is that they were cast at the regular polling places provided by law for the electors of the town to vote, outside the boundary lines of the town, and within the limits of the city of Lockport. The relator's contention may be stated in a form still more simple. He insists that the legislature has no power to establish or authorize a polling place for an election district beyond the boundary line of the district, though where the boundaries shall be and

when and how changed is a matter wholly in the power and discretion of the legislature. Of course the argument applies to a polling place located a few feet from the boundary line of the town or district, and in another town or district, with as much force as if located a mile outside. The extent of the deviation cannot be important.

Before discussing the legal merits of the relator's contention, it may be well to take a view of what may be called its moral aspect. The 514 electors of the town of Lockport that the relator insists voted illegally, voted at the same place that all the voters of that town have voted for thirty-three years. They all committed a felony if his contention be correct, to which they have no legal answer, since they knew all the facts and are presumed to have known the law. The electors of the town have been doing the same thing for over thirty years. Their illegal votes may have determined the presidency in 1884, and they certainly have elected or contributed to the election since 1865 of members of Congress, state officers, members of both houses of the legislature and county officers, some or all of whom must have been usurpers like the defendant. This is the necessary effect and consequence to which the relator's contention plainly points.

It is hardly necessary to say that such a position, before it can receive the approval of any court, must be sustained upon legal grounds that are unanswerable, since no one can claim for it the slightest element of equity or justice. But when we examine the legal grounds upon which the relator's claim is based, the case will be found to be as weak in that respect as it is in all its moral aspects.

We are told that the Constitution enacts that the elector must vote " in the election district of which he shall at the time be a resident and not elsewhere." So it does ; but what is an election district and by what power is it made, changed or abolished ? The Constitution has left all that to the legislature, and, hence, an election district is just what the legislature chooses to make it. In this respect it is supreme. It may say that the district shall be small or large, with such

territory as it thinks proper, and may even locate the polling places according to its own judgment and discretion. These details are sometimes delegated to local authorities, but it can confer no power upon them that it does not possess itself. If the district is so situated that there is no convenient place within it to hold an election, there is nothing in the Constitution that prohibits the legislature from authorizing the local authorities to locate the polling place on the other side of the imaginary line which bounds the district, where there may be such a place. In a word, the whole subject of creating election districts and locating the polling places where the residents of the district may vote, is with the legislature, and it may lawfully delegate this power to local authorities.

Bearing all this in mind, we may recall the facts of this case in order to see how much of substance there is in the relator's contention. The town of Lockport is, and ever since the year 1824 has been, one of the regularly organized towns of Niagara county. Five years later a village was organized in the center of the town, but the village still remained a part of the town, and the polling places for all the voters of the town were, on account of convenience of central location, established in the village. This state of things continued until 1865, when the village grew to be a city and was incorporated as such by chapter 365 of the Laws of that year. The territory of the village was somewhat enlarged in the creation of the new city, but the town was still left with territory surrounding the city on all sides. The charter contained this provision: "The town meetings and general election of the inhabitants of the town of Lockport, as hereby constituted, may be held at such places in the city of Lockport as the supervisor of said town and mayor of said city may appoint, with the same force and effect as if held in said town." (Laws of 1865, ch. 365, tit. 9, § 18.) What remained of the town was divided into two election districts, and the mayor and supervisor have ever since designated the place or room within the city where the electors of the town should

vote at town meetings and general elections. In pursuance
of this designation the 514 electors of the town, whose votes
are challenged in this action, registered and voted in the room
provided for that purpose by the mayor and supervisor, and it
is claimed now that there is something in the Constitution
which renders their votes thus cast absolutely void, and that is
the whole of the plaintiffs' case.

It should be observed that these electors residing in the
town outside the city limits did not vote at the polls of any
election district in the city of Lockport. The supervisor of
the town had nothing to do with the city election districts or
polling places. All that was regulated by the city authorities
themselves, and the polling place for the town was entirely
unconnected with any polling place for the city. At the place
in the city designated for receiving the votes of the residents
of the town, no elector residing in the city could register or
vote, even though he lived in the same building, or the same
room, which was designated as the town polling place. He
had to register and vote at his proper polling place designated
by the city authorities, and he had no more right to vote at the
town polling place at a general election than he had at a town
meeting, for the plain reason that he was not a resident of the
town.

The elector must vote at the polls of the election district in
which, at the time, he resides, and not *elsewhere*. No vote
can be registered, cast or counted in this state except at the
polling place of some election district. Hence, *elsewhere* in
the Constitution must mean some other polling place in some
other district than the one in which the voter resides. It is
perfectly clear that the disputed votes in this case were not
cast at the polling place of any election district in the city of
Lockport, and hence they were not cast *elsewhere*, within any
fair meaning of the Constitution. They were cast at the poll-
ing place designated by law for registering, receiving and
counting the votes of the electors of the *town*, and, hence, if
the town electors did not vote in the election district in which
they resided, within the meaning of the Constitution, it is plain

that they did not vote at all. They were merely engaged in a solemn farce, or playing with the forms and materials of an election, like children.

The election officers of the town who assembled at the place designated by law to register, receive and count the vote of the town, were doing the same thing. Of course, they could not be punished for any violation of the Election Law, however flagrant, nor could any voter, for the plain reason that there was no law for such an election any more than if they had held it on the other side of the Niagara river, in Canada. This is the logical result of the relator's contention, and to say that it is sound is simply to follow abstractions and ignore all common sense.

In the *McKane Case* (143 N. Y. 455) the defendant was convicted of a felony, in that he aided, counseled and advised the inspectors of election of one of the districts of the town to violate the Election Law in registering voters, and this court upheld the conviction. The vote of the whole town, consisting of six election districts, was registered and cast in the same building, but none of the eminent counsel engaged in the case ever supposed that it was, for that reason, an illegal election, or that the votes were, for that reason, void. This court was in possession of all the facts, and no one thought that such a point was even worthy of notice, and yet, if the relator's contention has any merit in it, McKane had committed no crime and was improperly convicted.

It was the legislature that drew an imaginary boundary line between the city of Lockport and the town with its two election districts. It can change or abolish that line at pleasure. When it drew the line between the city and town it had the power to do it with such reservations and modifications as it thought proper. When it incorporated the city it was with the reservation that it should still remain a part of the town for the purpose of designating a polling place within its limits, in order to serve the convenience of the voters of the town in the discharge of their duties at elections and town meetings. There is nothing in the Constitution that requires the voter,

when offering his vote, to stand on the soil embraced within the boundary lines of the district, or that prohibits the legislature from making a room or building in an adjoining district a part of the district where the voter resides for the purpose of registering and casting his vote. All that the Constitution requires is that the elector must vote at the polling place designated by law for casting the vote of the district where he resides, and the validity of his vote is not affected by the circumstance that the place is located on the wrong side of an imaginary line. When he does that he votes in the district of his residence and not elsewhere, within the spirit, and even within the letter of the Constitution.

The purpose of the restriction was to prevent fraud and repeating, and that purpose was as fully satisfied by the arrangement in this case as if the electors had assembled outside the city limits.

Numerous cases have been cited by counsel on both sides in support of their respective contentions, but I cannot perceive that any of them have much direct application. There is one case, however, not cited, which may be profitably recalled, since it serves to illustrate the nature of the question. Blackstone, in discussing the absurd effects and consequences of strict construction, says that, to avoid it, "we must a little deviate from the received sense of the words or language." That, of course, is an elementary rule, and to enforce its application he mentions, on very high authority, the case of a law in an ancient city named, which enacted "that whoever drew blood in the streets should be punished with the utmost severity." The learned author then tells us that it was held, after long debate, that this curious law did not extend to the case of a surgeon who opened the vein of a person that fell down in the street with a fit. (1 Black. Com. 60.)

It must be a matter of surprise to the modern student to learn that there was a long debate, or any debate at all, on such a question. The city in which the law existed was probably Greek in its origin, and we may credit the long debate to the subtlety of the Greek intellect, its tendency to refinement

and its aptitude for verbal disputation. But the question in this case is not very different in its nature and character. Indeed, when we look over the whole field, it would appear that the ancient lawyers who prosecuted the offending surgeon had a much stronger case than the relator has against the defendant. They could, at least, point to the statute and say to the court, " *Ita lex scripta est*," and that is rather more than the relator is able to do. He is met at every stage of his contention by the fact that not a single one of the 514 electors whose votes are challenged voted *elsewhere* than at the polling place of the election district of his residence, and so was within the scope of his right as defined by the letter and spirit of the Constitution.

An arrangement made by law for enabling the citizen to vote should not be invalidated by the courts unless the arguments against it are so clear and conclusive as to be unanswerable. Every presumption is in favor of the validity of such a law, and it is only when the courts are compelled by force of reason and argument that they will declare such a law invalid. The relator's contention is fraught with so much public mischief and confusion, with respect to elections in various parts of the state, that public policy would refuse to sanction it, even if the legal reasons in support of it were much stronger than they are. By chapter 134 of the Laws of 1870, qualified voters, residing on any Indian reservation within the state where there is no election district, may register and vote at the polls of the election district nearest their residence. There is a provision in the charter of Olean similar to that of Lockport, permitting the voters in the town outside to vote in the city. (Laws of 1893, chapter 478, § 25.) A similar provision is found in the charter of Jamestown (Laws of 1896, ch. 84, title 2, § 23), and also in the charter of Dunkirk. (Laws of 1885, ch. 396.) How many other cases of similar legislation there may be, we cannot know. In the nature of things such legislation must be quite common, since nearly all the cities of the state have grown out of town organizations.

To· hold that such regulations are in violation of the Constitution upon such grounds as are urged by the relator, would be, to say the least, very unwise. It is said that the three statutes last mentioned apply only to town meetings. If it be assumed that this is so, it is not perceived how that changes the question, or obviates the objection, if it be one. The restrictions of the Constitution apply to all elections " for all officers that now are or hereafter may be elected by the people." If a voter cannot cast a valid vote for superintendent of the poor outside the bounds of his election district, then it is difficult to see how an elector of the town can cast a valid vote for supervisor at a place beyond the town limits. But the objection in all cases ignores the fact that the legislature, in virtue of its plenary power over the whole subject of elections, has expressly permitted the voter to cast his vote at these places, with the same force and effect as at a place within the district or town, or, in other words, it has made the room or building designated a part of the town or district for the purpose of exercising the privilege of voting.

Finally, if it be granted that the contention of the relator be correct in its full length and breadth, it does not at all follow that votes cast at a lawful election by qualified electors, at a place designated by an unconstitutional law, are void. (*People* v. *Cook*, 8 N. Y. 67; *People* v. *Perley*, 80 N. Y. 624; *People* v. *Crissey*, 91 N. Y. 616; *People* v. *Kenney*, 96 N. Y. 294; *Demarest* v. *Mayor, etc.*, 147 N. Y. 203.) The present Election Law is so framed that thousands of votes are lost or rejected at every election, for the reason that illiterate voters are unable to comply with its provisions. There are many people who believe it to be unconstitutional, because it, in effect, disfranchises a large class of electors; and suppose the courts should so hold. Much stronger reasons could be alleged in support of such a proposition than any suggested in behalf of the relator in this case. But if the courts should hold the law invalid, as conflicting with the Constitution, would it follow that all the votes cast or elections held under it were void? To so hold would invite, not the reign of law,

but of anarchy, since the decision, carried to its logical consequences, would overthrow every power of government, without the ability to substitute anything in its place.

Suppose that the election officers in a city should, by mistake, or otherwise, locate the polling place on the wrong side of the street within the limits of another district. That would be a worse case than this, since here the polls were located just where the law provided. In that case it is quite likely the local election officers could be compelled by the process of the court, before the election, to change the place; but if it was not changed, and the voters cast their votes on election day at the place appointed, and they were received and counted, could it be said that the votes so given were void and that the citizen had lost his right to vote by the misconduct or error of the election officers? If that be so, then a wrong location of the polling place, by mistake or otherwise, would be more potent to defeat the will of the people than the worst evils of repeating, colonization or false counting.

The truth is that neither the Constitution nor any law attaches such absurd consequences to an error in the location of a polling place. The object of the Constitution is to secure to every citizen the right to cast one honest vote. To that end it enacts that he shall vote at his own home with his neighbors, where he is known, and not at some other polling place where he may not be known. But all this is fully complied with when he votes with his neighbors at the place designated by law for that purpose, and whether that place be located on one side or the other of an imaginary line bounding a town or a district is not, in the constitutional sense, a matter of the slightest consequence. To hold, under such circumstances, that his vote is a nullity, is to sacrifice his most important right to the fanciful notion that it could not be exercised outside of some boundary line, though the statute has, in plain terms, told him where and when to vote.

I have no doubt whatever that this case was correctly decided below, and the judgment should, therefore, be affirmed, with costs.

Vann, J. (dissenting). This action was commenced on March 4th, 1893, to oust the defendant from the office of superintendent of the poor of the county of Niagara, upon the theory that, on the 1st of January, 1893, he intruded into and, up to the time of the trial, had unlawfully held the same.

Upon the trial it appeared that, at the general election held in 1892, the relator and the defendant were the leading candidates for the office in question, and that the former received 6,747 votes, while the latter received 6,755, and was declared elected. The relator claimed that all votes cast by electors residing in the town of Lockport, one of the towns of Niagara county, were void and should not be counted, because they were deposited at polling places located outside of the election districts into which the town was divided. As he received but 178 votes in that town, while the defendant received 336, the effect of this claim, if sustained, would reduce the number of lawful votes cast for said candidates to 6,419 for the defendant and 6,569 for the relator, who would thus be elected.

The case was tried before the court without a jury, and the trial judge dismissed the complaint upon the ground that the votes cast by the voters of the town of Lockport at such election were properly cast and lawfully counted by the canvassing board of the county of Niagara. The relator appealed to the General Term, where the judgment rendered at Circuit was affirmed, and from the judgment of affirmance he has appealed to this court.

Niagara county was organized in 1808, and in 1824 a part of its territory was converted into the town of Lockport. (L. 1824, ch. 27.) In 1829 the village of Lockport was created and so located that it was entirely surrounded by the remaining territory of said town (L. 1829, ch. 78.) While this act provided for the election of village officers, it made no provision permitting the citizens of the town to vote within the village, but, in fact, from 1829 until 1865 the electors of the town held their elections and town meetings at convenient

points within the village.  In 1865 the city of Lockport was
incorporated, with four wards, each ward being an election
district, and the territory thus made into a city embraced the
village of Lockport and some additional territory taken from
the town, but the remaining portion of the town surrounded
the city on all sides.   (L. 1865, ch. 365.)  Section 2 of title 9 of
the city charter provided that " the town of Lockport shall con-
tinue to be one of the towns of Niagara county, embracing all
the territory included within the present town of Lockport,
excepting that which is included within the limits of the city
corporation organized by this act."

Section 18 of the same title provided that " the town meet-
ings and general election of the inhabitants of the town of
Lockport, as hereby constituted, may be held at such places in
the city of Lockport as the supervisor of said town and the
mayor of said city may appoint, with the same force and
effect as if held in said town."

By chapter 120 of the Laws of 1886 the charter of the city
of Lockport was revised, but none of the changes made affect
the questions now before us and no territory was added to or
taken from the city.   Section 18 of title 9 of the original
charter became section 269 of the revised charter without any
substantial alteration.   Since the organization of the city, the
town meetings and elections of the town of Lockport have
been held at convenient places in the city, designated pursu-
ant to said provision of the charter.   No polling places were
provided in the town and the voters thereof were compelled
to vote at the polls located in the city or they could not vote
at all.   No question was raised as to the legality of elections
thus held until the general election in November, 1892, when
the close vote in the county for superintendent of the poor
led to the present controversy.   At the time of said election
the town of Lockport had been divided into two election dis-
tricts, and the polling place for the first district, designated
according to the city charter, was in a building situated within
the city, known as No. 11 Main street, which was in the second
election district of the first ward of the city of Lockport.

64

The polling place for the second district, designated in the same way, was also inside of the city limits, in a building known as No. 49 Locust street, which was in the first election district of the third ward of said city. Each of said polling places was about one mile from the nearest boundary of the said election districts of the town. The polling places for the city were distinct from those for the town, and no elector residing in the city voted at either of the town polling places, and no voter residing in the town voted at any of the city polling places. Prior to the election in question the town board designated the same polling places for the two election districts of the town that had been designated by the mayor and supervisor under the city charter. It is not claimed that there was any fraud at the election or any illegal votes cast at the polling places where the electors of the town cast their votes, nor is it claimed that the votes as cast and canvassed did not represent the wishes of the voters.

The first question presented for decision is whether the legislature had the power, under the circumstances, to authorize electors residing in the town to vote in the city. The answer to this question must be found in section 1 of article 2 of the Constitution, which, so far as material, is as follows : "Every male citizen of the age of twenty-one years, who shall have been a citizen for ninety days, and an inhabitant of this state one year next preceding an election, and the last four months a resident of the county, and for the last thirty days a resident of the election district in which he may offer his vote, shall be entitled to vote at such election in the election district of which he shall at the time be a resident, and not elsewhere, for all officers that now are or hereafter may be elective by the people; *   *   *" When the charter of the city of Lockport was enacted in 1865, the wording of section 1 of article 2 of the Constitution was somewhat different, although the meaning, so far as the point now under discussion is concerned, was the same. (Const. of 1846, art. 2, § 1.) In 1874, however, said section was so amended as to read the same as it does now, with the exception of a single word relating to

the length of time that the elector must have been a citizen, so that when the revised charter was passed in 1886 the Constitution was practically the same as it is at the present time. (Const. of 1846, as amended in 1874, art. 2, § 1.)

While the Constitution regulates the qualifications of voters, it also defines the territory within which each voter may exercise the elective franchise. The qualifications depend upon sex, age, citizenship and the like, but no person, even with these qualifications, can vote wherever he chooses, for the right is limited to the election district in which he resides at the time he deposits his ballot. The words "and not elsewhere," which appear in every Constitution except the first, are an express limitation. The command of the Constitution is that the elector must be a resident of the election district in which he offers his vote, and that he shall be entitled to vote only in that election district. He must reside in the election district where he votes, and can vote only in the election district where he resides. In the fall of 1892, did the electors of the town of Lockport reside in the districts where they voted, within the meaning of the Constitution? No part of either of the two districts into which the town was divided was geographically a part of the city. Both were territorially wholly outside of the city. No elector of the town resided in the city, yet both of the polling places provided for the town were in the city. The electors of the town, in order to vote, had to cross over the town line and the district line into the city. They had to leave the bounds of the election district where they resided and enter an election district in which they did not reside. They lived in the town and did not live in the city, yet they voted in the city and not in the town. The language of the charter, already quoted from section 2 of title 9, shows that the city and the town are distinct political divisions, with no common territory. The town has its own supervisor, elected wholly by its own voters, and each ward of the city has its own supervisor, elected wholly by its own voters.

Although the language of the statute does not indicate such

an intention, assume that "the right of the town voter was not taken away," but was "reserved" by the city charter; that the election districts were "projected" into the city so as to embrace the polling places designated therein for the town, and that No. 11 Main street and No. 49 Locust street were thus made, theoretically, a part of the town for election purposes, still it cannot be denied that they are also a part of the city for election purposes. A resident of either of those houses could, therefore, vote at a town election by virtue of his theoretical residence in the town, and at a city election by virtue of his actual residence in the city. This absurdity shows the hazard of holding that a resident of the town can vote in the city, for a man cannot reside in two places at once. If he resides on his farm in the country, he cannot, at the same time, reside at No. 11 Main street or No. 49 Locust street in the city.

It is obvious that in November, 1892, no elector of the town of Lockport resided in the district where he voted, if the language of the Constitution is to be given its ordinary meaning. When that instrument says that a man possessing certain qualifications "shall be entitled to vote  *  *  *  in the election district of which he shall, at the time be a resident, and not elsewhere," it means actual residence as that term is understood in the law. It does not mean that he can reside, even for the purpose of voting only, in a house that possibly he never entered until he offered his vote, for residence imports personal presence; nor does it mean that district lines can be so commingled that the place of residence can be in two election districts at the same time.

No one would think of so construing the Constitution as to make it mean that a person could, for any purpose, be a resident of both city and town on the same election day, were it not for the temporary inconvenience of holding otherwise. Convenience has nothing to do with the meaning of the Constitution, which does not change in order to accommodate a community. Its broad and general rules are made for the government of the entire state, and they do not vary because

1898.]     People ex rel. Lardner *v.* Carson.     509

N. Y. Rep.]          Dissenting opinion, per VANN, J.

a few hundred people want them to. The Constitution is not a leaden rule that bends up and down, so as to measure twelve inches when the surface is smooth and eleven when it is rough, but it is constant, uniform and inflexible, and all must obey its commands whether convenient or inconvenient. It does not bend "to suit the law of the hour," and considerations of expediency should not be yielded to in expounding its provisions. Its words should be given their usual meaning unless the context shows a different intention, of which there is no evidence in the case in hand. It should receive that direct, simple and exact construction that is adapted to a fundamental law upon which all other laws rest. A strained construction of the Constitution, made to meet an emergency, is an injury to jurisprudence, for it disturbs the foundations of the law and trifles with the confidence that is reposed in the judgments of courts. It is dangerous to hold that the word "resident" has two different meanings in the same sentence, or that "a resident of the county" means one who has his home within the county lines, while "a resident of the election district in which he may offer his vote," may mean one whose home is not in the same district as his polling place. While town lines do not limit the legislature, for they are not mentioned in said section, clearly county lines cannot be crossed so as to authorize a resident of one county to vote in another. If the boundaries of Niagara county cannot be projected into those of an adjoining county for election purposes, it is difficult to see how the boundaries of one election district can be projected across those of another, for residence within the district is as obligatory as residence within the county.

The learned counsel for the respondent claims that the words "at the polls of" should be substituted for the word "in" so that the Constitution would read "shall be entitled to vote at such election *at the polls of* the election district of which he shall at the time be a resident."

It is our duty to so construe the Constitution as to give effect to the presumed intention of the people in adopting it,

and that intention must be gathered, if possible, from the instrument as it is written. As we can neither add to nor take from the constitutional qualifications of voters, so we cannot add to or take from the place specified where the voter may exercise the right of voting. The words of the clause in question are presumed to have been used according to their ordinary and natural meaning, and when thus read, if they present a definite meaning that is not so unreasonable as to be absurd, we must adopt that meaning as the only one intended to be conveyed. Where the language is plain and presents no ambiguity, the court must confine its attention to the law as written and not allow words to be inserted by implication, which is always dangerous, and should never be resorted to except in cases of imperative necessity, arising from grave doubt as to what was meant.

We are also urged to hold that the practical construction of this provision of the Constitution by the legislature should have great weight, but, as said by Judge Story, " Contemporary construction   *   *   *   can never abrogate the text ; it can never fritter away its obvious sense ; it can never narrow down its true limitations ; it can never enlarge its natural boundaries." (Story on Const. Lim. § 407.) There is not in this case that extensive usage or general contemporaneous construction that is sometimes allowed to prevail when doubts arise on the face of the instrument. Practical and contemporary construction should never be resorted to when, as in the case before us, the meaning is clear and uniform, even if some hardship is the result. No encouragement should be given to the belief, now widely prevalent, that if an unconstitutional law can be acted upon long enough to make it a hardship to declare it void, the courts will not interfere. It is better that a small·proportion of the inhabitants of the state should suffer temporary inconvenience than to permit the will of the mass of the people, as expressed in the adoption of the Constitution, to be defeated by a loose construction that may invite abuses and promote disorder.

It is further argued that, as the power existed, prior to the

creation of the city, to establish polling places anywhere in the territory of the town, the right to still establish them anywhere in that territory was reserved by the city charter and, hence, was never lost.    The answer to this is that the Constitution expressly prohibits an elector from voting elsewhere than in the district where he resides, and it impliedly prohibits the inclusion of the same territory in more than one election district at the same time.    Its object is to secure purity of elections by requiring the voter to cast his vote in the place where he is best known, or as near to his own home as possible.    As the Supreme Court of Pennsylvania said, under somewhat similar circumstances, " Without the district residence no man shall vote, but having had the district residence the right    *    *    *    is to vote in that district.    Such is the voice of the Constitution.    *    *    *    Whoever would claim the franchise which the Constitution grants, must exercise it in the manner the Constitution prescribes." (*Chase* v. *Miller*, 41 Pa. St. 403, 427.)

For these reasons I think that the judgments of the courts below should be reversed and a new trial granted, with costs to abide the event.

Bartlett, Haight and Martin, JJ., concur with O'Brien, J., for affirmance ; Parker, Ch. J., and Gray, J., concur with Vann, J., for reversal.

Judgment affirmed. _____