STATE *v.* GARRETT E. LYONS, *et al.*

*(April* 12, 1939.)

RODNEY and SPEAKMAN, J. J., sitting.

*James R. Morford,* Attorney-General, *Clair J. Killoran* and *Thomas Herlihy, Jr.,* Deputy Attorneys-General, for the State.

*Stewart Lynch* and *Warren Roberts* for the defendants.

Court of General Sessions for New Castle County, Indictment No. 52, January Term, 1939.

SPEAKMAN, J., delivering the opinion of the Court:

The defendants have filed fourteen reasons in support of their motion to quash the indictment. In view of our conclusions we shall consider, in their order, but five of these reasons, prefacing our discussion by the language of the reasons.

1. "That said purported indictment was not presented and returned by a legally constituted Grand Jury in that the Act of the General Assembly (*Ch.* 1, *Vol.* 37, *Laws of Delaware*) purporting to propose an amendment to the *Constitution of Delaware* changing and reducing the number of members of the Grand Jury for New Castle County, and the Act of the General Assembly (*Ch.* 3, *Vol.* 38, *Laws of Delaware*) agreeing to such proposed amendment are in conflict with *Article* II, *Section* 16 of the *Constitution* of the State of Delaware, and therefore void and without legal effect."

*Article* 1, *Section* 4 of the *Constitution* provides "Trial by jury shall be as heretofore."

In 1931 it was desired to amend the *Constitution* so as to reduce the number of Grand Juroros from the accustomed number of twenty-four to fifteen in New Castle County, and ten in each of the other counties. The provisions concerning amendments to the *Constitution* are found in *Article* 16.

It there appears that:

"Any amendment or amendments to this Constitution may be proposed in the Senate or House of Representatives * * *." *Section* 1.

The section then provided that if two-thirds of each house agrees to the amendment it shall be so entered upon the respective Journals and shall be published by the Secretary of State three months before the next General Election, in at least three newspapers of each county. It further provided that if, in the General Assembly next after said General Election, the proposed amendment shall again be agreed to by two-thirds of all the members elected to each house, the said amendment shall become a part of the *Constitution*.

In 1931 an amendment to *Article* 1, *Section* 4 of the *Constitution* was proposed in the form of "An Act proposing an Amendment to *Section* 4 *of Article* 1 of the *Constitution* of the State of Delaware, relating to trial by jury." *Chap.* 1, *Vol.* 37, *Laws of Delaware, p* 3.

No question is raised as to the proper passage of the amendment, its publication by the Secretary of State in due and proper form, nor as to its subsequent final adoption in 1933. *Chap.* 3, *Vol.* 38, *Laws of Delaware, p.* 29.

The defendants contend that the action taken in amending the *Constitution* was violative of *Article* 2, *Sec.* 16 of the *Constitution,* which provides:

"No bill or joint resolution * * * shall embrace more than one subject, which shall be expressed in its title."

■ It is only necessary to observe that there is no requirement that a suggested Constitutional amendment shall be by "bill or joint resolution." It is only necessary that the amendment be "proposed" in either house of the General Assembly, and we are not at liberty to determine what particular form such proposal shall take.

■ *Article 2, Section 16* of the *Constitution,* relied on by the defendants, has been repeatedly passed upon by the Courts. It has been uniformly held that the principal purpose of the provision is that the title of a bill after its introduction shall be sufficiently comprehensive to give the people, as well as members of the Legislature, fair and reasonable notice of the subject matter of the proposed legislation and to prevent deception by provisions of which the title gives no intimation. *In re Cypress Farms Ditch,* 7 *W. W. Harr.* (37 *Del.*) 71, 180 *A.* 536; *State v. Ferschke,* 2 *Boyce* 477, 81 *A.* 401; *Discount & Credit Corp. v. Ehrlich,* 7 *W. W. Harr.* (37 *Del.*) 561, 187 A. 591.

■ An ordinary bill becomes effective as a law by the action of the General Assembly and approval by the Governor. Unless some such provision as is contained in *Article 2, Sec.* 16 should exist, legislators and citizens in general might have no fair knowledge of impending legislation until it shall have been finally adopted. No such arguments apply to constitutional amendments. These cannot become effective by the action of one General Assembly. Newspaper publication three months before the next General Election, inclusion in the official volume of laws, and the necessity of action by the succeeding General Assembly assure an opportunity to the people of this State to become acquainted with the contents of the proposed amendment. We do not think that *Article 2, Sec.* 16, has any reference to constitutional amendments.

We, however, do not hold that the title of the proposed

amendment, found as *Chap.* 1, *Vol.* 37, and *Chap.* 3, *Vol.* 38, would be defective even if *Article* 2, *Sec.* 16, had application.

We assume rather than clearly understand, that the objection of the defendants is largely based upon the thought that *Article* 1, *Sec.* 4, "Trial by jury shall be as heretofore" has reference to trial by a Petit Jury and has no reference to a Grand Jury, and therefore when an amendment has reference solely to a Grand Jury that the amendatory provisions are ineffectual.

Having held that *Art.* 2, *Sec.* 16, has no application to constitutional amendments it is perhaps unnecessary to consider the matter further. We would, however, remark that unless Grand Juries are embraced within the provisions of *Art.* 1, *Sec.* 4, "Trial by jury shall be as heretofore", then there seems to be no constitutianal Grand Jury provided for and therefore no constitutional guarantee or assurance of Grand Jury action. No other provision of the *Constitution* seems to preserve the historical and highly prized safeguard of Grand Jury action, although it is provided that

"No person shall for any indictable offense be proceeded against criminally by information." *Art.* 1, § 8.

2. "That said purported indictment was not returned by a legally constituted Grand Jury in that *Chap.* 241, *Vol.* 40, *Laws of Delaware,* entitled 'An Act To Amend *Chapter* 131 Of *The Revised Code Of Delaware* (1915) As Amended, In Relation To Juries', is in conflict with *Article* 2, *Sec.* 16 of the *Constitution of Delaware,* and therefore void and without legal effect."

The defendants contend that the *Statute, Chap.* 241, *Vol.* 40, deals with both Grand Juries and Petit Juries, and that these are two separate and distinct institutions. The defendants therefore contend than an Act which, in its

title, refers to "Juries" generally, covers two subjects and is therefore repugnant to the *Constitution*. The original *Statute,* to which the *Act* now under discussion is amendatory, provided that the Jury Commissioners should draw the twenty-four Grand Jurors; the amendment to the *Statute* provided for the Jury Commissioners to draw the number of Grand Jurors as provided by the above mentioned amendment to the *Constitution*. Without indicating any approval of the defendant's argument, we purposely fail to discuss the cases cited under this branch of the case. To us it seems that the *Act, Chap.* 241, *Vol.* 40, *Laws of Delaware,* has nothing whatever to do with the validity of the indictment here questioned. The number of Grand Jurors is fixed by the *Constitution;* the Jury Commissioners are bound thereby and can draw no more. The new *Act* is merely directory and it is quite immaterial to the present matter whether the new *Act* is in force or not, or whether the original *Act* is still operative, since the number of Grand Jurors is fixed by the *Constitution.*

3. "That said purported indictment was not presented and returned in accordance with the provisions of the *Constitution* of the State of Delaware and the *Statutes* of the State of Delaware in that said purported indictment was presented and returned on the evidence of witnesses who were not sworn and qualified by a person authorized by statute to administer oaths and in the open Courtroom, but in fact the Foreman of the Grand Jury attempted to qualify and swear the witnesses in the Grand Jury Room without authority in the premises, as shown by an affidavit attached to this motion."

With the motion to quash the indictment the defendants have filed an affidavit of one of the witnesses before the Grand Jury, to the effect that he was sworn by the Foreman of that Grand Jury, and by no one else, and that this the defendants contend, renders the indictment invalid

as having been found upon unsworn testimony. The Court is usually loath to inquire as to transactions within the Grand Jury room but because the Court, of its own knowledge, knows of the uniform practice for the Foreman of the Grand Jury to administer oaths to witnesses before it, so the validity of the present indictment will be tested by the present objection.

The defendants refer us to *Sec.* 4709 of the *Revised Code* of 1935, which provides: "The Chancellor, any Judge, Justice of the Peace, or Notary Public, shall have authority, in any case in which an oath, or affirmation, is necessary, or proper, to administer such oath, or affirmation," and the defendants contend that this *Statute* is exclusive. It is quite difficult to arrive at this conclusion, for it is a fact that in almost every criminal case in Delaware, witnesses in open court are sworn through the instrumentality of the Clerk of the Peace or his Deputy, and in every civil case witnesses are sworn by the Prothonotary or his Deputy. It will not do to say that these oaths are administered in the presence of the Court and by its order, for under the *Statute* there is no more authority given to the individual judge to delegate the authority given to him than there is for a Notary Public so to do, and that contention we think would not be seriously made.

The exact contention of the defendants is illusory. They contend (1) that the *Statute* is exclusive and that oaths can only be administered by those persons named in *Sec.* 4709, *supra,* together with others given express statutory authority, and (2) that at common law witnesses before a Grand Jury were sworn in open Court, and that such is the only method that can legally be followed in Delaware. We shall briefly consider both contentions.

The *Act* now found as *Section* 4709, *supra,* was originally enacted on January 20, 1829, as part of "An Act concerning the administering of certain oaths and affirmations"

and applying to commissions appointed by the respective Courts (*Vol. 7; Laws of Delaware, p.* 181).

Now of course it is certain that before that time many generations had enjoyed an established system of jurisprudence and that in Grand Jury proceedings witnesses had been duly sworn or affirmed. The power to swear witnesses before Grand Juries existed long prior to the *Act.* The *Act* we think was declaratory of the power of those named therein, and was not intended to lay down any procedure for legal proceedings.

The defendants contend that at common law witnesses before a Grand Jury were sworn in open Court before their appearance before the Grand Jury and to this effect is cited the *English Statute of* 56 *Geo. III, Chap.* 87. We have not seen this *Statute,* but its obvious date makes it inapplicable here, except as explanatory of English cases. Whether the *Act* was declaratory of the common law of England, or whether it was enacted to make the practice in England more uniform, it is difficult to say. The English cases cited to us are not particularly pertinent. In *Rex v. Dickinson, Russ & Ry.* 401, 161 *Eng. Rep.* 866, the witnesses were not sworn at all; in *Middlesex Sp. Com.,* 11 *Ch. & Fin.* 155, 8 *Eng. Rep.* 1060, the oath had been administered when the Court was not in session, so neither of these cases is pertinent to the question now considered.

Much reliance is placed on *Com. v. Price,* 3 *Pa. Co. Ct. R.* 175. The Pennsylvania *Statute* of 1860 provided:

"The foreman of any grand jury, or any member thereof, is hereby authorized and empowered to administer the requisite oaths or affirmations to any witness whose name may be marked by the district attorney on the bill of indictment." (19 *P. S. Pa.,* § 731).

The true holding of *Com. v. Price* was that the Grand Jury had no authority to swear any witnesses whose names had not been endorsed on the indictment by the District Attorney. *Com. v. Feenix,* 6 *Pa. Dist. & Co. R.* 15, 16.

Regardless of *Com. v. Price,* the more recent Pennsylvania cases of *Com. v. Zavaglia,* 12 *Pa. Dist. & Co. R.* 529, and *Com. v. Kenehan,* 12 *Pa. Dist. & Co. R.* 585, hold that under the *Pennsylvania Act* the foreman of the Grand Jury has the right to administer the oath to all witnesses before it, whether the names were presented by the District Attorney or otherwise. Both cases approve and adopt the further principle "that, regardless of the *Act of* 1860, the foreman of the grand jury has the right to administer oaths to witnesses appearing before the grand jury upon investigations as in all other cases, this right being based upon immemorial custom so long acquiesced in by the various Courts * * * of Pennsylvania as to become part of the common law of Pennsylvania."

This succinctly presents our view as to the situation in Delaware. We have never had a Statute which in any way refers to the swearing of witnesses before a Grand Jury. So far as we are informed, there has never been a time in our history that witnesses before a Grand Jury were not sworn by the foreman. No record exists of any witnesses in Delaware having ever been sworn in open Court prior to their appearance before the Grand Jury. As said in *State v. Fasset,* 16 *Conn.* 457:

"A practice so ancient and so uniform, growing up under the eyes of the court, is certainly strong evidence of what is the law. If the law requires every witness examined by the grand-jury to be sworn in court,—is it possible, that when it must have been known almost necessarily to court and counsel, in the numerous cases in which indictments have been found, that witnesses were not sworn in court,—that no lawyer and no judge should have ever before doubted the legality of these indictments?"

The Court also pointed out that a strict observance of the ancient *English Rule* would require that the oath to witnesses in Court be administered by the Crier, and not by the Clerk (*Middlesex Sp. Com.,* 6 *Car. & P.* 90, 172 *Eng. Rep.* 1159).

■ We are clearly of the opinion that the custom and usage of the swearing of witnesses before a Grand Jury, by the Foreman thereof which, so far as we are informed, has existed from the very foundation of the State, forms a part of the common law of Delaware and is not subject to exception.

In view of our conclusion it is not necessary to consider cases like *Reg. v. Russell*, 1 *Car.* & *Mar.* 247, 174 *Eng. Rep.*, where the Court holds that even an incorrect mode of swearing the witnesses would not vitiate an indictment.

4. "That said purported indictment was not returned in accordance with the provisions of the *Constitution* of the State of Delaware and the Statutes of Delaware in that said purported indictment was returned by a Grand Jury, one of the members of which was not qualified to be a grand juryman, in that he was not a qualified elector as required by the provisions of 4721, *Section* 1 of *Chapter* 131 of the *Revised Code of Delaware*, 1935, he not being a registered voter, as shown by the affidavit attached to this motion."

*Section* 4721 of the *Revised Code* of 1935 provides in part:

"All persons qualified to vote at the general election shall be liable to serve as jurors."

■ The defendants contend that because one of the Grand Jurors was not a registered voter he was therefore not qualified to vote, and therefore could not serve as a Juror. Much could be said that the Statute refers to the liability of service and not to a qualification, but such question need not be considered. The Defendants object solely on the ground that the Juror was not registered as a voter and so was not qualified to vote. This matter has been precisely ruled on in this State in *McComb v. Robelen*, 13 *Del. Ch.* 157, 116 *A.* 745, 747, where the late Chancellor Wolcott *held* that registration as a voter is not a qualification to

vote, but is only an evidence of the existence of the necessary qualifications as established by the *Constitution*.

5. "That each and every count of said indictment is invalid and of no effect because on its face it does not set forth the crime for which the defendants and each of them can be prosecuted, that in each and every count the said indictment charges a conspiracy to violate *Chap.* 103, *Vol.* 33, *Laws of Delaware* (*Revised Code of Delaware, 1935, Chap.* 60, *Art.* 5) which said law is unconstitutional in that it is in conflict with the provisions of *Article* 5 of the *Constitution* of the State of Delaware adopted June 4, 1897, there beng no power in the General Assembly to enact a statute authorizing the casting of ballots by persons who are not personally present at the polling places on election day."

The defendants, in short, contend that the *Constitution of Delaware* contemplates and requires that electors shall be personally present at the election, and that the Legislature had no power, under existing constitutional provisions, to provide for the casting of ballots by mail or by absentee voters.

*Article* 5, *Sec.* 2 of the *Constitution of Delaware* provides in part:

"Every male citizen of this State of the age of twenty-one years who shall have been a resident thereof one year next preceding an election, and for the last three months a resident of the county, and for the last thirty days a resident of the hundred or election district in which he may offer to vote, and in which he shall have been duly registered as hereinafter provided for, shall be entitled to vote at such election in the hundred or election district of which he shall at the time be a resident, and in which he shall be registered * * *."

Now of course the critical words and those most requiring consideration are "in which he may offer to vote" as indicating the action by the electors, and "shall be entitled to vote at such election in the hundred or election district of which he shall at the time be a resident, and in which

he shall be registered" as indicating the place where the election is to be held.

The industry of defendants' counsel has furnished us with the language from a long list of election laws of the State of Delaware, in which the phrase "offer to vote" has been used, such laws reaching back to Colonial days. From these the defendants conclude, and we think correctly conclude, that such legislation contemplated the personal attendance of voters at the polls, for until recent years no other method of the casting of a ballot was at all provided. It by no means, however, necessarily follows that because a long continued statutory use of the expression "offer to vote" had reference to a personal appearance at the polls that the Legislature was powerless to enact a law by which, under prescribed conditions, certain absentee electors could vote. It is not necessary that express power be given by the *Constitution* to the Legislature to enact legislation regarding elections, or legalizing the casting of votes by absentee voters. The *Constitution* does not consist of a series of powers expressly delegated to the people, acting through the Legislature. Rather the power of the Legislature exists, except in so far as expressly or impliedly limited by the *Constitution*. Whether the language "offer to vote" contemplates a personal attendance by the voter and a personal casting of the vote can only be correctly determined by a consideration of all the material and pertinent provisions of the *Constitution*.

The *Constitutions* of many states require that voters shall live a specified time in the district in which they "offer to vote." The quoted phrase has been construed many times with reference to the necessity of the personal attendance of the voters, and there has been a sharp division of views on the subject.

The casting of a ballot by absentee voters had its main

origin in the days of the Civil War, although certain statutes antedated that conflict. The statutes in the older cases often provided that the ballots should be cast at the military encampment outside of the state, and the cases originated with that background and the construction of the language requiring residence of a voter in the district "in which he may offer to vote" was tinged with the thought of a vote outside of the State. Many more recent statutes embody provisions similar to our *Delaware Act*. Under our statute certain stipulated classes of persons may vote though not able to be present at the polls on election day. In general, the statute provides that a person entitled to vote by mail shall make a sworn application to the Clerk of the Peace; this officer furnishes the voter with an official ballot and with appropriate envelopes; the voter secretly marks his ballot before an officer authorized to administer oaths and the ballot is returned to the Clerk of the Peace in a special sealed envelope bearing the affidavit that the provisions of the law had been carried out; the Clerk of the Peace then delivers the ballot in its sealed envelope as received by him, to the proper election officers on the day of election; these election officers during the election remove the ballot from the sealed envelope in which it was placed by the voter and without invading the secrecy of the ballot insert it in an official envelope and place it in the ballot box so that it cannot there be distinguished from ballots voted by persons actually present at the polls. Much could and has been said as to the thought that under the Delaware statute the ballot, while marked where the voter happens to be, is actually offered or cast when placed in the box by the election officers.

The defendants mainly rely on *People v. Blodgett*, 13 *Mich.* 127; *Chase v. Miller*, 41 *Pa.* 403; *Re Contest Election in 5th Ward of Lancaster*, 281 *Pa.* 131, 126 *A.* 199, 35 *A.*

*L. R.* 815; *Baca v. Ortiz,* 40 *N. M.* 435, 61 *P.* 2*d* 320; *Thompson v. Scheier,* 40 *N. M.* 199, 57 *P.* 2*d* 293.

The State mainly relies on *Jenkins v. State Board of Elections of North Carolina,* 180 *N. C.* 169, 104 *S. E.* 346, 14 *A. L. R.* 1247; *Goodell v. Judith Basin County,* 70 *Mont.* 222, 224 *P.* 1110; *People v. Carson,* 155 *N. Y.* 491, 50 *N. E.* 292; *Straughan v. Meyers,* 268 *Mo.* 580, 187 *S. W.* 1159; *Jones v. Smith,* 165 *Ark.* 425, 264 *S. W.* 950. See, also, 73 *U. of P. Law Review* 176.

In view of our conclusion hereinafter reached, a detailed consideration of these cases could serve no useful purpose. It would necessarily be extended and could not be restricted within reasonable limits.

There are two considerations in connection with our *Delaware Constitution* which did not exist in connection with any of the cited cases, and these seem to us to plainly indicate the meaning of our *Constitutional* provisions and are thus determinative of the present question.

"(a) Absentee voting as considered in connection with the debates of the Delaware Constitutional Convention in 1897."

 Where the debates of a *Constitutional Convention* clearly point out the purpose of a particular provision of the *Constitution,* the aid of such debates is valuable and satisfactory. 1 *Cooley Const. Law* 142; 11 *Am. Jur.* 706. Especially is this true when the *Constitution* became effective, as in Delaware, upon its adoption by the *Convention,* and was not subject to subsequent ratification by vote of the people.

*Article* 5, *Sec.* 2 of the *Constitution* "concerning elections" came before the *Constitutional Convention* sitting as a committee of the whole. Judge Spruance, from the *Committee on Elections,* said:

"I say this [*Article* 5, *Section* 2] is based mainly upon the corresponding provision in the *New York Constitution.*"

He then cited the provisions of *Article 2, Sec. 1* of the *New York Constitution* which, with modifications, were substantially embodied in the *Delaware Constitution.* To the *New York Constitution* there had been added the following important and significant provision:

"Provided that in time of war no elector in the actual military service of the State, or of the United States, in the army or navy thereof, shall be deprived of his vote by reason of his absence from such election district; and the Legislature shall have power to provide the manner in which and the time and place at which such absent electors may vote, and for the return and canvas of their votes in the election districts in which they respectively reside."

As to this provision Judge Spruance said:

"That applied more particularly, perhaps, to such times as in the late War of the Rebellion when large numbers of citizens were in the service of the country and their votes, under special act of Assembly, were taken in the field. It was thought that such an unfortunate condition of affairs as that would not be likely to occur again. At all events, it was so removed that we thought it was not necessary to put it in."

It is therefore an inescapable fact that the direct question of absentee voting came before the *Convention* and was intentionally eliminated in so far as citizens in actual military service were concerned. The inference is unmistakable that the *Convention* expressly refrained from providing for absentee voting, but left the *Constitution* as it theretofore had been.

While it is of course true that the refusal of the *Constitutional Convention* to affirmatively provide for absentee voting does not necessarily operate as a denial of the power of the Legislature to provide for that method of balloting, yet from the debates certain clear inferences appear. It clearly appears that it was determined not to include provisions for absentee voting by those actually in the Military Service. It seems also apparent that it was never thought by the *Convention* that a right existed in the Legislature to provide for a general statute as to absentee voting, for in

such circumstances it would have been entirely unnecessary to consider especially those in the Military Service.

In the *Constitutional* debates there are many statements indicating the clear understanding that the casting of a ballot was to be effected by the personal presence of the voter at the polls.

"(b) Absentee voting as affected by *Article* 5, *Sec.* 3, concerning challenge of voters."

If any lingering doubt remained in our minds as to the fact that the *Constitution* contemplated the personal attendance of voters at the polls, such doubt would be dissolved upon a consideraion of *Art.* 5, *Sec.* 3. That section seeks to provide with great particularity against any form of bribery, and further provides that no person who has been guilty of bribery in any of its forms shall vote; it further provides that upon challenge for any of the causes relating to bribery the person so challenged shall swear or affirm before the election officers that he has not "received or accepted, or offered to receive or accept, or paid, transferred or delivered, or offered or promised to pay, transfer or deliver, or contributed, or offered or promised to contribute to another, to be paid or used, any money or other valuable thing as the compensation, inducement or reward for the registering or abstaining from registering of any one qualified to register, or for the giving or withholding, or in any manner influencing the giving or withholding, a vote at such election."

The election officers are prohibited from receiving the vote unless the person so challenged shall make the affidavit but "such oath or affirmation shall be conclusive evidence to the election officers of the truth of such oath or affirmation."

Now the *Constitution* had carefully prescribed for uniform laws for the registration of voters with proper pro-

visions for determining that prospective voters duly possess the necessary and prescribed qualifications. It was provided that all questions of the qualifications of voters should be determined before election day and that on that day, beyond the fact of the identity of the persons, the sole ground of challenge should be the violation of *Article 5, Sec. 3*, as above set out.

The *Constitution* by *Article 5, Sec. 3*, has been explicit in its attempt to frustrate bribery. Any vote can be challenged by alleging the violation by the voter of *Sec. 3*. No voter can meet that challenge without his personal presence at the polls. The *Constitution* of course contemplates that when a voter has duly exercised his right of suffrage that such vote shall be received and counted. A challenged vote at the polls can only be received and counted when the voter is personally present to meet the challenge. It therefore necessarily and inescapably follows that the *Constitution* contemplated the personal attendance of the voter at the polls so as to insure the counting of his vote.

The same result is arrived at from other circumstances. The *Constitution* provides authority to challenge a voter at the polls, either upon the ground that he is not the person registered, or has been guilty of bribery. The *Election Laws* provide for the appointment and the powers of the challenger. This challenger may raise the question of identity of the voter, or of bribery, either from his knowledge of the voter's name, or it may be raised from his knowledge of the voter himself, even though he may not be entirely familiar with the name. Absentee voting would in a large measure affect this Constitutional right of challenge.

From a very thorough study of the problem we are convinced that the *Constitution* as it exists at present contemplates and requires the personal attendance of the voter

at the polls, and no power now exists in the Legislature to provide for absentee voting. We are led to this conclusion both from the express provisions of the *Constitution* and the plain inference drawn therefrom.

It can make no difference that we should have preferred to have arrived at a different conclusion. Our personal approval of a limited provision for absentee voting can have no effect when the provisions of the *Constitution* are, in our opinion, entirely clear.

We are entirely familiar with the maxim *"ut res magis valeat quam pereat"* so often laid down in this and other Courts and "that the thing may prevail rather than be destroyed" has a special significance in determining the constitutionality of the statute. We know that in every doubtful case the doubt is resolved in favor of the constitutionality of the statute, and we have many cases so holding. When, however, a statute plainly violates the organic law as expressed in the *Constitution*, if this is to remain a government of law and not of men, it is the plain duty of the Court to hold the statute unconstitutional, leaving the perfection of the statue to be brought about by proper constitutional amendment.

It is our opinion that the statutory authority for voters to cast their ballots by mail is unconstitutional under the present provisions of the *Constitution*. Because the present indictment is plainly and admittedly drawn with reference to that particular statute alone, we feel compelled to quash the indictment.

We are not passing upon any question as to whether the act alleged, if committed, constituted a conspiracy to commit a common law offense, but as the indictment is now drawn it must be quashed.